## IN THE UNITED STATES DISTRICT COURT
## FOR THEDISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLONY INSURANCE CO. | ) | Case No. 1:07-cv-00834 |
| | ) | |
| | ) | |
| Plaintiff, | ) | **DECLARATORY JUDGMENT** |
| | ) | **ACTION** |
| v. | ) | |
| | ) | |
| MECHANICAL INTERGRITY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF COLONY INSURANCE COMPANY'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**COME NOW,** plaintiff Colony Insurance Company ("Colony"), by and through

its counsel, to hereby move this Honorable Court, to deny defendant Mechanical

Integrity, Inc.'s ("MI") Motion to Dismiss pursuant F.R.C.P 12 (b)(2), and Motion to

Transfer Venue pursuant to 28 U.S.C. § 1391.

The grounds for this Motion are set forth in *Plaintiff Colony Insurance*

*Company's Opening Brief in Opposition to Mechanical Integrity, Inc. Motion to Dismiss*

*and Transfer Venue* which was filed contemporaneously with this Motion.


**HECKLER & FRABIZZIO**


s/ Daniel L. McKenty
DANIEL L. MCKENTY (I.D. No. 2689)
The Corporate Plaza
800 Delaware Avenue, Suite 200
P.O. Box 128
Wilmington, DE  19899-0128

## IN THE UNITED STATES DISTRICT COURT
## FOR THEDISTRICT OF DELAWARE

COLONY INSURANCE CO.                )
                                    )       Case No. 1:07-cv-00834
                                    )
        Plaintiff,                  )       **DECLARATORY JUDGMENT**
                                    )       **ACTION**
        v.                          )
                                    )
MECHANICAL INTERGRITY, INC.         )
                                    )
        Defendant.                  )

## **PROPOSED ORDER**

Upon consideration of Colony Insurance Company's Opposition to Defendant

Mechanical Integrity Inc.'s Motion to Dismiss and Motion to Transfer Venue,

Mechanical Integrity's Motion is hereby **DENIED.**

_____

                **J.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THEDISTRICT OF DELAWARE

COLONY INSURANCE CO.     )
     )     Case No. 1:07-cv-00834
     )
      Plaintiff,     )     **DECLARATORY JUDGMENT**
     )     **ACTION**
     v.     )
     )
MECHANICAL INTERGRITY, INC.     )
     )
     Defendant.     )

## CERTIFICATE OF SERVICE

I, **Daniel L. McKenty,** hereby certify that on the 8th day of April 2008, copies of

the attached *Colony Insurance's Company's Response to Mechanical Integrity Inc's*

*Motion to Dismiss and Transfer Venue* were served upon the following via first

electronic filing:

> Robert K. Pierce, Esquire
> Ferry, Joseph & Pierce, PA
> 824 North Market Street, Suite 904
> Wilmington, DE  19899

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COLONY INSURANCE CO. | ) | |
| | ) | Case No. 1:07-cv-00834 |
| | ) | |
| Plaintiff, | ) | **DECLARATORY JUDGMENT** |
| | ) | **ACTION** |
| v. | ) | |
| | ) | |
| MECHANICAL INTERGRITY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

### <u>PLAINTIFF COLONY INSURANCE COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANT, MECHANICAL INTERGRITY, INC'S MOTION TO DISMISS OR TRANSFER</u>

**HECKLER & FRABIZZIO**

DANIEL L. MCKENTY (I.D. No. 2689)
The Corporate Plaza
800 Delaware Avenue, Suite 200
P.O. Box 128
Wilmington, DE  19899-0128

# TABLE OF CONTENTS

I.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    MI's contacts with Delaware . . . . . . . . . . . . . . . . . . . . . . . 9

III.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    MI's Marketing and Sales in Delaware are
        Sufficient to Establish This Court's Personal Jurisdiction
        over MI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

        1.    Personal jurisdiction over MI is consistent with due
            process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

            a.    MI purposefully targeted its marketing efforts
                towards Delaware residents through its commercial
                website resulting in sales to
                residents of Delaware. . . . . . . . . . . . . . . . . . . . 10

            b.    The declaratory action arises out of or relates to
                MI's activities in Delaware . . . . . . . . . . . . . . . .11

            c.    MI cannot overcome the presumption that the
                District of Delaware assertion of personal
                jurisdiction is reasonable and fair. . . . . . . . . . .12

        2.    The Delaware long arm statute permits the exercise of
            personal jurisdiction over MI. . . . . . . . . . . . . . . . . . 13

            a.    MI transacts business in Delaware under Section
                3104(c)(1) of the long arm Statute . . . . . . . . . .13

            b.    MI has caused tortious injury in Delaware
                by an act in Delaware under section
                3104 (c)(3) of the long arm statute. . . . . . . . . . . 14

    B.    Venue is proper in Delaware because personal jurisdiction exists there. .14

    C.    Defendant has not met its burden to support transfer to Texas:
        Texas is not clearly more convenient nor would transfer
        serve the interests of justice. . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

　　　　1.　　The private factors do not favor transfer . . . . . . . . . . . . 16

　　　　2.　　The public factors do not favor transfer. . . . . . . . . . . . . 17

IV.　　Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

**Cases**

3D Sys., Inc. v. Aarotech Lab., Inc.,
160 F.3d 1373 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

Affymetrix v. Synteni, Inc.
28 F. Supp. 2d 192, 199 (D. Del 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

American Bio Medical Corp. v. Peninsula Drug Analysis Co., Inc.,
No. Civ. A. 99-218 SLR, 1999 WL 615175 (D. Del. Aug 3, 1999) . . . . . . . 11, 14

Inamed Corp v. Kuzmak,
249 F.3d 1356 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13

Intel Corp. v. Broadcom Corp.,
167 F. Supp. 2d 692, (D. Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Jumara v. State Farm Ins. Co.,
55 F.3d 873, 879 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

LaNuova & B, Sp.A. v. Bowe Co., Inc., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
513 A.2d 764, 768 (Del. 1986)

Motorola Inc. v. PC-Tel, Inc,
58 F. Supp. 2d 349, (D. Del. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Nice Sys. Inc. v. Witness Sys. Inc.,
No. Civ A 06-311 JJF, 2006 WL 2946179 (D. Del. Oct. 12, 2006) . . . . . . . 15, 17

North American Phillips Corp.,
35 F.3d at 1578-79, (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Optical Recording Corp v. Capitol, EMI Music, Inc
803 F Supp 971, 974 (D. Del. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.,
6 F. Supp. 2d 349, 354 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Pierce v. Haywood Indus., Inc.
No. 05-5322, 2006 WL 3242274 (E.D. Pa. Nov. 6, 2006) . . . . . . . . . . . . . . . 12

Shutte v. Armco Steel Corp.,
431 F.2d 22, 25 (3rd Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

Toys "R" Us,
318 F.3d at 453-454. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

VE Holding Corp. v. Johnson Gas Appliance Co.,
917 F.2d 1574, 1583 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Zippo Mfg Co. v. Zippo Dot Com, Inc.,
952 F. Supp 1119, (W.D. Penn 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

**Statutes**

28 U.S.C. 1391(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 15

28 U.S.C. §1400(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 15

28 U.S.C. §1404 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

10 Del C. § 3104 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 14

## TABLE OF APPENDICES

| Appendix | Description |
|---|---|
| A | First Purchase Order |
| B. | Dupont's General Conditions |
| C. | Second Purchase Order |
| D. | Dupont Complaint |
| E. | www.mechanicalintegrityinc.com |
| F. | American Bio Medical Corp. v. Peninsula Drug Analysis Co., Inc., No. Civ. A. 99-218 SLR, 1999 WL 615175, (D. Del. Aug 3, 1999) |
| G. | Nice Sys. Inc. v. Witness Sys. Inc., No. Civ A 06-311 JJF, 2006 WL 2946179 (D. Del. Oct. 12, 2006) |
| H. | Pierce v. Haywood Indus., Inc. No. 05-5322, 2006 WL  3242274 (E.D. Pa. Nov. 6, 2006) |

Plaintiff Colony Insurance Company ("Colony"), by and through its attorney, Daniel L. McKenty, herby submits the following brief in opposition to Defendant Mechanical Integrity, Inc.'s ("MI"), motion to dismiss or transfer.

## I    SUMMARY OF ARGUMENT

Colony brought this action requesting that the District Court of Delaware analyze the facts in an underlying lawsuit initiated by E. I. Dupont de Nemours and Company ("Dupont"), a Delaware corporation, in the District Court of Delaware against MI, pursuant to a forum selection clause in the contract between DuPont and MI, and determine if, pursuant to those facts, Colony can deny defense and coverage to MI pursuant to an insurance contract issued to MI by Colony.   Notwithstanding MI's arguments to the contrary, both personal jurisdiction and venue are proper in Delaware.

MI is subject to personal jurisdiction of this Court because it has directed its marketing and sales activities towards, and sold services and products to Delaware residents, namely Dupont.  MI offered its services and products to Delaware companies and residents through its interactive website.  Furthermore, MI has sold its services and products to a Delaware corporation.  Having intentionally transacted business with Delaware residents, MI cannot avoid this Court's personal jurisdiction, which is proper under both the Federal due process test and the Delaware long arm statute.

Venue is also proper in the District Court of Delaware under 28 U.S.C. § 1400(b) because MI "resides" there within the meaning of 28 U.S.C. §1391(c).  Because personal jurisdiction is proper in the District of Delaware, venue is also proper there.  There is also no basis for transferring this matter to Texas because MI has not demonstrated that the transferee forum is "clearly more convenient", nor has it shown that such a transfer

7

would serve the interest of justice. Colony's chosen forum, the District of Delaware has

substantial ties to the events giving rise to this litigation. Colony's potential witnesses,

namely Dupont employees, are also located in Delaware.

Therefore, MI's motion to dismiss for lack of personal jurisdiction and venue, and

its motion to transfer, should all be denied.

## II.     FACTUAL BACKGROUND

On or about February 2, 2004, DuPont and MI entered into a contract, Purchase

Order No. 4500104098, MI was to perform a "guided wave" ultrasound inspection on

DuPont's chloroform pipeline supplying their Louisville, Kentucky plant. (copy attached

as appendix A). The purchase order expressly incorporates DuPont's General

Conditions. (copy attached as appendix B). The parties contract contained a forum

selection clause, and by signing the contract MI consented and submitted exclusively to

the jurisdiction of and service of process of the Courts of the State of Delaware. (See

Appendices "A" & "B").

MI conducted its inspection from March 31 through April 1, 2004, and was paid

$13,429.97 by Dupont for these services. Following its inspection, MI issued an

Inspection Report detailing its findings.

On November 3, 2005, Dupont entered into another contract with MI, Purchase

Order No. 4500405916, to perform a follow-up inspection of the pipeline (copy attached

as appendix C). Again, Dupont's General Conditions were attached to the Purchase

Order whereby MI consented and submitted exclusively to the jurisdiction and service of

process of the Courts of the State of Delaware. The follow-up inspection was scheduled

to take place on November 17-19, 2005.

On November 18, 2005, a chloroform leak was discovered on a section of the pipeline that was allegedly inspected by MI. As a result of the chloroform leak Dupont had to expend over two million to remediate the surface and soil adjacent to the spill location.

As a result, on June 1, 2007, MI was sued in the District Court of Delaware in E. I. Dupont de Nemours and Company v. Mechanical Integrity, Inc., Civil Action No: 07-346.

The Complaint in the above-captioned matter alleged that MI committed breach of contract, misrepresentation, and fraud. (copy attached as appendix D).

On June 25, 2007, as a result of this lawsuit, MI filed a claim under an insurance policy issued by Colony requesting defense and indemnity for the underlying Dupont Suit. Based on the allegations brought against MI by DuPont in E. I. Dupont de Nemours and Company v. Mechanical Integrity, Inc., Civil Action No: 07- 346, Colony filed this Declaratory Judgment Action in Delaware asking the District Court of Delaware to adjudicate the rights and obligations of the parties pursuant to the contract of insurance.

**A.    MI's contacts with Delaware.**

As discovery has yet to begin, Colony is limited in its efforts to prove a nexus between MI and the State of Delaware. However, MI is a Texas Corporation that offers equipment, engineering, services, training and consulting services. (See www.mechanicalintegrityinc.com web pages copy attached as appendix E). At the time the Complaint was filed, MI conducted business through this website. The site does not have geographical restrictions and allows purchases from all fifty states within the U.S. MI has also sold products and services to Dupont, a Delaware Corporation. See Exhibits

9

A & C.  In fact, MI has signed a contract with Dupont wherein MI consented and

submitted exclusively to the jurisdiction of and service of process of the Courts of the

State of Delaware.   (See appendices A, B, C, D, & E).

## III.    ARGUMENT

### A.    MI's Marketing and Sales in Delaware are Sufficient to Establish This Court's Personal Jurisdiction over MI.

MI has directed it marketing and sales activities towards and sold its products and

services to Delaware Corporations, namely Dupont.  This court may assert personal

jurisdiction over MI because (1) such an assertion would not violate due process; and (2)

Delaware's long arm service permits service of process, and thus the exercise of personal

jurisdiction. See <u>Inamed Corp v. Kuzmak</u>, 249 F.3d 1356, 1359 (Fed. Cir. 2001).

#### 1.    Personal jurisdiction over MI is consistent with due process.

This Court may constitutionally exercise specific jurisdiction over MI because

each element of the three prong due process test is satisfied: (a) MI purposefully directed

its activities towards Delaware residents; (b) the alleged tortious conduct arises from

those activities and (c) the assertion of jurisdiction is reasonable and fair.  <u>3D Sys., Inc. v.</u>

<u>Aarotech Lab., Inc.</u>,160 F.3d 1373, 1378 (Fed. Cir. 1998).

##### a.    MI purposefully targeted its marketing efforts towards Delaware residents through its commercial website resulting in sales to residents of Delaware.

This Court may exercise specific jurisdiction over MI because this cause of action

arose, in part, from MI's marketing, solicitation and sale of its products and services to a

Delaware corporation.  See Exhibits E, A, C.  Further, MI contracted with a Delaware

corporation and expressly consented, via said contract, to litigate the underlying action in

the District Court of Delaware.  Next, MI requested defense and indemnity from Colony based on occurrences arising from said contract.

MI also marketed and offered its services and products through an interactive website.  (See Appendix E).  Anyone of these activities, standing alone, is sufficient to establish personal jurisdiction.  See <u>Zippo Mfg Co. v. Zippo Dot Com, Inc.</u>, 952 F. Supp 1119, 1124-26 (W.D. Penn 1997) (explaining that interactive commercial websites would create personal jurisdiction and holding that a company doing business through its website was subject to the court's jurisdiction.); <u>Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.</u>, 6 F. Supp. 2d 349, 354 (D.N.J. 1998) (court held a single sale in forum state sufficient to confer specific personal jurisdiction).  <u>Toys "R" Us</u>, 318 F.3d at 453-454. (case that discusses that forum selection clause in contracts are factors to consider when determining if personal jurisdiction exists).

Even if each activity were not enough standing alone, the combination of the four activities is certainly sufficient.  <u>American Bio Medical Corp. v. Peninsula Drug Analysis Co., Inc.</u>, No. Civ. A. 99-218 SLR, 1999 WL 615175, at *4. (court exercised specific personal jurisdiction in Delaware over defendant who offered to sell services and/or products to Delaware residents through defendant's website and participated in out-of-state sale negotiations with a Delaware resident even when no sales were made in Delaware. (copy attached as appendix F); <u>Pierce v. Haywood Indus., Inc.</u> No. 05-5322, 2006 WL 3242274, at *5. (to the extent that a direct solicitation or contractual agreement is sent via email leads to a civil action jurisdiction is regularly exercised."). (copy attached as Appendix H).

MI directed its activities toward Delaware and sold its services and products to a Delaware corporation. Therefore, the first element of the personal jurisdiction test is unquestionably satisfied.

        **b.**      **The declaratory action arises out of or relates to MI's activities in Delaware.**

MI cannot deny that the declaratory judgment action filed against it arises out of or relates to its activities in Delaware. MI had solicited the business of DuPont, a Delaware corporation, and actually sold it services and products to Dupont on three separate occasions as evidence in the purchase orders attached hereto as Exhibit __. 3D Sys. Inc.160 F3d at 1378. (the test is whether the activity in the forum is a basis for the cause of action."). Inamed Corp., 249 F3d at 1363. (It is significant that the constitutional catch phrase "arises out of or relates to" is disjunctive in nature, indicating an added flexibility and signaling a relaxation of the applicable standard from a pure 'arises out of' standard. Thus, the second element of personal jurisdiction is also satisfied.

        **c.**      **MI cannot overcome the presumption that the District of Delaware assertion of personal jurisdiction is reasonable and fair.**

Because Colony has satisfied the first two elements of the due process test, the burden shifts to MI to persuade this Court that the exercise of personal jurisdiction would be unreasonable and unfair. Id. A decision that personal jurisdiction is unreasonable or unfair should be "limited to the rare situation in which the plaintiff's interests in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of objecting the defendant of litigation within this forum." Id. Colony has a clear interest in adjudicating this dispute in Delaware.

MI has failed to present a "compelling case" that the exercise of jurisdiction would be unreasonable or unfair. Id. at 1364.

Because Colony has demonstrated that all three elements of the due process test are satisfied, this Court should hold that an exercise of personal jurisdiction over MI would not offend due process.

> ### 2.    The Delaware long arm statute permits the exercise of personal jurisdiction over MI.

The Delaware long arm statute provides several independent bases on which the Court may assert jurisdiction over a non-resident defendant. See 10 Del. C. § 3104(c). The Delaware Supreme Court has stated, "Delaware's long arm statute should be broadly construed . . . to the maximum extent possible under the due process clause." Intel Corp. v. Broadcom Corp., 167 F. Supp. 2d 692, 700. Colony has already demonstrated that this Court would not offend due process by exercising its jurisdiction over MI. Thus, at least one provision of the Delaware long-arm statute should be construed to permit jurisdiction over MI. Motorola Inc. v. PC-Tel, Inc, 58 F. Supp. 2d 349, 356. (holding that the Delaware long-arm statute is co-extensive with due process).

> #### a.    MI transacts business in Delaware under Section 3104(c)(1) of the long arm Statute.

MI has transacted business in Delaware within the meaning of 10 Del. C. § 3104 (c)(1) because, as demonstrated above, its conduct was part of a general business plan where the effects of its tortious conduct were felt in Delaware. MI's solicitation of Delaware corporations and its actual sales to them constitute transacting business under §3104(a)(1) by offering to sell and selling products and services in Delaware before and after the filing of this lawsuit. Intel Corp., 167 F. Supp 2d at 703; American Bio Medica

Corp., 1999 WL 615175 at *4. (holding that defendant who offered to sell product and

services to Delaware corporations through its Internet website, even though no products

were sold in Delaware, had transacted business pursuant to §3104.)  Even though MI may

not have been present in Delaware, its activities took place in Delaware within the

meaning of §3104. Intel Corp., 167 F. Supp. 2d at 701. (court rejected the defendant's

argument that none of this activity took place in Delaware).

> **b.    MI has caused tortious injury in Delaware by an act in Delaware under section 3104 (c)(3) of the long arm statute.**

MI caused tortious conduct in Delaware pursuant to §3104 (c)(3) by offering to

sell and actually selling products and services to Delaware residents.  LaNuova & B,

Sp.A. v. Bowe Co., Inc., 513 A.2d 764, 768 (Del. 1986). ("a single act or omission in the

state in which the injury was caused will suffice" to establish jurisdiction under §3104

(c)(3).)  MI cannot claim that its acts did not occur in Delaware. North American Phillips

Corp., 35 F.3d at 1578-79. (holding as a matter of federal law, that the tort occurs "where

allegedly tortious sales are made").  As such, MI's sales of its services to a Delaware

Corporation, Dupont, confers personal jurisdiction over it pursuant to § 3104(c)(3).

**B.    Venue is proper in Delaware because personal jurisdiction exists there.**

Venue is proper in the District of Delaware under 28 U.S.C. §1400 (b) because

MI "resides" in Delaware. 28 U.S.C. § 1391 (c) (providing that a defendant corporation

resides "in any judicial district in which it is subject to personal jurisdiction at the time

said action is commenced).  Because Colony has demonstrated that MI is subject to

personal jurisdiction in the District of Delaware, venue is also proper there. VE Holding

Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1583 (Fed. Cir. 19990). North

American Phillips Corp, 35 F.3d at 1577 ("Venue lies ipso facto if we hold, as we do, that the district court has personal jurisdiction over the corporate defendant.").

C.     **Defendant has not met its burden to support transfer to Texas: Texas is not clearly more convenient nor would transfer serve the interests of justice.**

In resolving § 1404 (a) requests for transfer, courts analyze both private and public factors. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3rd Cir. 1995). Private factors include: (1) plaintiff's choice of forum; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses—but only to the extent the witnesses may actually be unavailable for trial in one of those for a; and (6) the location of files and records. Id. Public factors include: (1) the enforceability of the judgment; (2) practical considerations that could make trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two for a resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; (6) the familiarity of the trail judge with applicable state law in diversity cases. Id. at 879-80. The burden is on MI to establish that the balance of the interests weigh strongly in favor of the requested transfer. Nice Sys. Inc. v. Witness Sys. Inc., No. Civ A 06-311 JJF, 2006 WL 2946179 at *1. (Attached as appendix G). A transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. Id. MI has fallen far short of meeting its burden to justify transfer.

1.     **The private factors do not favor transfer**

Far from weighing strongly in MI's favor, the private factors actually weigh against transfer. First, Colony's choice of forum is to be accorded "paramount

15

consideration." <u>Shutte v. Armco Steel Corp.</u>, 431 F.2d 22, 25 (3rd Cir. 1970). MI's burden in this regard is especially difficult to overcome because Delaware has a very strong connection to this suit because the effects of the underlying tortious conduct were felt in Delaware. <u>Affymetrix v. Synteni, Inc.</u>, 28 F. Supp. 2d 192, 199 (D. Del 1998). Furthermore, the related action in tort was brought in Delaware. Further, MI contracted with a Delaware Corporation and agreed to be sued in Delaware in that underlying suit. Additionally, Delaware is already familiar with the subject matter of this declaratory action.

Secondly, the convenience of the witnesses and records do not favor transfer to Texas. While MI's witnesses may be located in Texas, all of Colony's witnesses as well as documentary evidence are located either in or around the Delaware area. <u>Jumara, 55 F.3d at 879</u> (convenience of witnesses is only relevant to the extent that they would be unavailable for trial in the forum). MI has provided no evidence that their witnesses would be unavailable in Delaware or that they would be unable to produce to documentary evidence in Delaware. (court did not consider location of records where defendant did not contend that they "could not be produced it would be unavailable in the forum state.") <u>Id.</u> at 879.

A transfer of this case from Delaware to Texas would merely shift the inconvenience from MI to Colony. <u>Nice Sys., Inc.</u>, 2006 WL 2946179 at *2. Therefore, these factors clearly weigh against transfer.

Finally, the effect of the tortious conduct that brings rise to this claim has occurred in Delaware. Therefore, on balance, the factors weigh against transfer and this court should retain this action.

2.    **The public factors do not favor transfer**

MI has failed to establish that the public factors warrant transfer. While the contract of insurance may have been signed in Texas, MI has not pointed to any other factor that weighs in favor of transfer, and thus failed to meet its burden. The fact that the Delaware Court is already familiar with the subject matter of this suit through related litigation. <u>Optical Recording Corp v. Capitol, EMI Music, Inc</u>. 803 F. Supp 971, 974 (D. Del. 1992) (motion to transfer denied where court familiar with patents from prior litigaton). This court should deny MI's motion to transfer venue and retain this matter in the District of Delaware

## III.    CONCLUSION

For the foregoing reasons, Colony respectfully requests that this Court deny MI's motion to dismiss for lack of personal jurisdiction and venue, and its motion to transfer venue.

**HECKLER & FRABIZZIO**

---

DANIEL L. MCKENTY (I.D. No. 2689)
The Corporate Plaza
800 Delaware Avenue, Suite 200
P.O. Box 128
Wilmington, DE  19899-0128

# **EXHIBIT A**

**DUPONT**

E.I. du Pont de Nemours and Company

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
PO Box 398
HUMBLE TX  77347

### Purchase order

PO number/date
4500104098 / 02 Feb 2004
Contact person/Telephone
Fields, Kathy/502 775-3013
Our fax number
502 775-3032

Your person responsible
Donene Ashley

Please enter our order as specified below subject to terms and conditions
listed on both the face and/or reverse side of this purchase order. Any
additional or different terms in seller's form(s) are material alterations and
are hereby rejected.
1. If price, terms, and required receiving date or other conditions and instructions
are not acceptable immediately advise buyer shown below.
2. Furnish complete shipping information and include 2 copies of packing list
with each shipment. Show purchase order number / release number on each
package, packing list, invoice, bill of lading, and all correspondence.

Your vendor number with us
8015960

Please deliver to:
LOUISVILLE WORKS MFGG 2350 C5
4131
4200 CAMP GROUND RD.
LOUISVILLE KY  40216-4602

Mail your invoice to address indicated below:
E I DuPont de Nemours and Co., Inc.
Nashville Payment Center
P.O.Box 367
Old Hickory, TN 37138-0367

Terms of deliv.: 000 - Delivery terms do not apply
Terms of payt.: Net 60 days from receipt of invoice
Currency:       USD

Invoices shall be sent to:
  E. I. duPont de Nemours and Company
  P.O. Box 16350
  Louisville, KY 40256
  Attention:  Jennifer Leasor
Insurance certificates shall be presented to DuPont's at the site.
GENERAL CONDITIONS - Contractor will perform all services in
accordance with DuPont's General Conditions GC-1, dated 2-26-04 hereto
and made a part hereof.  Any inconsistent terms or conditions
submitted by Contractor shall not apply unless they are: (1) reduced
to writing and signed by both Parties hereto; and  (2) expressly
referred to as being modifications of the General conditions.
GUIDELINES FOR CONTRACTOR - Contractor shall comply with DuPont's

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

**DUPONT**

**E.I. du Pont de Nemours and Company**

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
PO Box 398
HUMBLE TX   77347

PO number/date
4500104098 / 02 Feb 2004

Page
2 /    4

Louisville, Kentucky Site Conditions dated 10/16/03, attached hereto
and made a part hereof.  Contractor and any subcontractors may be
required to furnish to DuPont a written safety program that all
Contractor and subcontractor employees shall be required to follow
while on the job site.  Minimum acceptable program shall meet OSHA and
DuPont's requirements

| Item | Material<br>Order qty. | Unit | Description | Price per unit | Net value |
|------|------------------------|------|-------------|----------------|-----------|
| 00010 | 1.000 | Perf Unit | Inspect Chloroform Line at Rohm & Haas | | |
| | Deliv. date | Day 02/23/2004 | | | |

Inspect Chloroform Line at Rohm & Haas
R Harold Skidmore  Phone (502) 775-3286  Contract Administrator

This order issued for contract inspection of the chloroform line
on Rohm and Haas property per quotation document #3151 and rate
sheet re-issued Feb. 27, 2004 from John D McMillan (Phone:
(281)540-0314
Fax: (281)540-0317)

John T Stamm  Phone (502) 775-3159

Work schedule as mutually agreed to by DuPont and Contractor.

Total quantity split over the following delivery dates:
Qty. Unit      Deliv. date

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

**E.I. du Pont de Nemours and Company**

DUPONT

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC                    PO number/date                    Page
PO Box 398                                  4500104098 / 02 Feb 2004   3 /    4
HUMBLE TX  77347

---

| Item | Material | | Description | | |
|------|----------|------|-------------|------|------|
| | Order qty. | Unit | | Price per unit | Net value |

The item covers the following services:

| 00020 | | | INSPECT CHCL3 LINE AT ROHM & HAAS | | |
|-------|-------|-----------|---------------|-----------|-----------|
| | 1.000 | Perf Unit | | 1,429.97 | 1,429.97 |

Deliv. date  Day 06/02/2004

INSPECT CHCL3 LINE AT ROHM & HAAS
Inspect Chloroform Line at Rohm & Haas
01/19/2004 19:08:46 R Harold Skidmore (PPM120) Phone (502)
775-3286
This order issued for contract inspection of the chloroform line
on Rohm
and Haas property.
Contractor: Mechanical Integrity, Inc.
          1423 East First Street
          Humble, TX  77338
          Phone: (281)540-0314
          Fax: (281)540-0317
01/20/2004 18:53:55 John T Stamm (OJ6165) Phone (502) 775-3159
3159
$12,000 ESTIMATE PER SKIDMORE
ADDING $1429.97 TO COMPLETE PO

Total quantity split over the following delivery dates:
                    Qty. Unit    Deliv. date

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

**DUPONT**

**E.I. du Pont de Nemours and Company**

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
PO Box 398
HUMBLE TX  77347

PO number/date
4500104098 / 02 Feb 2004

Page
4 /    4

| Item | Material | | Description | | |
|------|----------|------|-------------|------|------|
| | Order qty. | Unit | | Price per unit | Net value |

**The item covers the following services:**
Expected value of unplanned services:        1,429.97

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

**EXHIBIT B**

## GENERAL SERVICE CONDITIONS

These General Service Conditions apply to any contract, contract order, or other form of agreement in which they are incorporated by reference.

References to the Agreement include these General Service Conditions.

"DuPont" and "Supplier" are the Parties identified as such in the Agreement.

All headings of the Sections of these General Service Conditions and Addendum are inserted for convenience only and shall not affect any construction or interpretation of the Agreement.

### 1.  Definitions.
In addition to any terms defined elsewhere in the Agreement, the following terms have the following meanings:

(a)  "Affiliate" means any person, partnership, joint venture, corporation or other form of enterprise, domestic or foreign, including subsidiaries, which directly or indirectly Control, are Controlled by, or are under common Control with DuPont.

(b)  "Control" means the direct or indirect ownership of twenty percent (20%) or greater, or any lesser ownership interest if such is the maximum allowed by law.

(c)  "Divested Business" means any business unit, or any part or portion thereof, as reasonably determined by DuPont, which DuPont sells or otherwise transfers the assets or ownership to a third party acquirer. The term "Divested Business" shall mean such business unit or the acquirer thereof, as applicable.

(d)  "Intellectual Property" means copyrights (including the right to use, reproduce, modify, distribute, publicly display, and publicly perform the copyrighted work), trademarks (including trademark, trade names, service marks, and trade dress), patents (including the exclusive right to make, use and sell), trade secrets, rights of publicity, rights of privacy, moral rights, goodwill and all other intellectual property rights as may exist now and/or hereafter come into existence and all renewals and extensions thereof, regardless of whether such rights arise under the law of the United States or any other state, country or other jurisdiction.

(e)  "Services" means all of the services and work provided by Supplier as set forth in the Agreement and the Scope of Work.  Services will also include all of the current or future, necessary, customary, and appropriate services to the same extent that such services are, from time to time, provided by Supplier to its other customers when Supplier is supplying services substantially similar to the Services being provided hereunder, even if the specific services are not set forth in the Agreement.

(f)  "Site" means any DuPont or Affiliate owned or leased premises.

(g)  "Trading Partners" means current or potential independent contractors, customers; and suppliers or vendors; and distributors, of DuPont and Affiliates.

(h)  Except as provided in any addendum to these General Service Conditions, "Work Product" shall mean all drawings, designs, specifications, models, perspectives, ideas and improvements, software and other Intellectual Property developed by Supplier for DuPont in the performance of Services.

### 2.  Services Provided by Supplier.
Supplier agrees to provide Services and such personnel as referenced in the Agreement, including the Exhibits hereto. Supplier shall, except as otherwise expressly stated herein, furnish sufficient, competent, fit and knowledgeable personnel, materials, tools, equipment, facilities, permits and services, and do all things necessary to perform the work herein in a safe and environmentally sound manner.

### 3.  Location of Service.
Supplier's employees will perform Services at the location(s) provided in the Agreement.

### 4.  Personnel.
(a)  If service categories are referenced in the Agreement, then personnel, if any, provided by Supplier will be in one (1) or more of the referenced service categories.  Services shall be performed in the best and most workmanlike manner by qualified and efficient personnel. DuPont has the right to advise of specific skills required and to review the qualifications of personnel prior to assignment. If DuPont advises Supplier that any individual assigned to DuPont work, or proposed for assignment to DuPont work, fails to meet the requirements set forth by DuPont, or is otherwise deemed unacceptable by DuPont for any other reason, then Supplier shall, at the option of DuPont, replace such individual. Should a Supplier employee assigned under the Agreement be unable to continue performing services because of illness, resignation or any other cause beyond Supplier's reasonable control, then Supplier will make reasonable efforts to replace such personnel with replacement personnel reasonably acceptable to DuPont. If Supplier fails to provide replacement personnel reasonably acceptable to DuPont, then DuPont reserves the right to eliminate all or part of the assignment without further liability.

(b)  In the event DuPont wishes to extend an assignment beyond the original expiration date, DuPont will notify Supplier at least fifteen (15) days prior to said expiration. Supplier shall supply the same personnel during the agreed-to extension period unless otherwise determined by DuPont.

(c)  DuPont shall have the right to reduce the duration of any assignment at any time. Upon notice from DuPont for any reason (other than a reason prohibited by applicable laws, rules or regulations), Supplier shall remove any Supplier employee as soon as practical.

### 5.  Scope.
Supplier hereby agrees that any Affiliate, domestic or foreign, shall have the right, but not the obligation, to receive services under the terms and conditions of the Agreement, without additional royalty or charge, by providing Supplier with written notice of the Affiliate's election to so receive services. If DuPont or the non-United States Affiliate deem it appropriate to conform the terms and conditions of the Agreement to local law, custom and practice, Supplier or its affiliate will use commercially reasonable efforts to enter into

- DuPont Confidential -

Form Rev. February 7, 2005

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

a local written agreement to so effectuate the provisions of the Agreement.

**6.    Independent Contractor.**
The employees, subcontractors, methods, facilities and equipment used by Supplier shall be at all times under its exclusive direction and control. Supplier's relationship to DuPont under the Agreement shall be that of an independent contractor, and nothing in the Agreement shall be construed to constitute Supplier, its subcontractors or any of their employees as an employee, agent, associate, joint venturer, or partner of DuPont. It is agreed that Supplier's employees, who are assigned to DuPont work under the Agreement, shall at all times be and remain employees of Supplier.

**7.    Cooperation with DuPont Contractors.**
Supplier shall cooperate in good faith with DuPont and any DuPont contractor, to the extent reasonably required by DuPont.  This cooperation will include, by providing, from time to time, as necessary or appropriate, in writing, to the extent available, applicable requirements, standards and policies for the Services so that the goods and services provided by the DuPont contractor:
(a)    may be:
    (i)    integrated with the goods and services, including the Services DuPont or any third party and .
    (ii)    operated by Supplier, DuPont or any other third party and

(b)    are compatible with the DuPont or contractor computer systems in each such case to the extent necessary to provide the Services.

**8.    Subcontracting and Offshore Outsourcing.**
Supplier's obligations hereunder shall be performed solely by employees of Supplier.    Supplier shall not, without DuPont's prior written consent, subcontract or delegate performance of any of its obligations hereunder. Supplier shall be fully responsible for the performance of any such subcontractor or agents.  Supplier will not, directly, indirectly or via subcontractors or agents, provide any Services from locations outside the United States without the prior written consent of DuPont.

**9.    Work Product and Title.**
Supplier hereby assigns to DuPont all rights, title and interest in and to all Work Product. This assignment shall not include previously patented or copyrighted Intellectual Property by Supplier or a third party.  However, Supplier hereby grants to DuPont and its Affiliates a nonexclusive, royalty-free, worldwide, perpetual license to use such Supplier or third party Intellectual Property only in conjunction with the use of Work Product.

Should any Work Product qualify for protection under United States patent or copyright law or similar laws in other relevant countries and if DuPont wishes to apply for Intellectual Property protection in the United States or foreign countries, Supplier, at the request of DuPont, shall provide all reasonable assistance to obtain patent and copyright protection or other Intellectual Property protection including execution of papers deemed necessary or advisable for the filing and prosecution of applications, and for providing confirmation of the legal title of DuPont to the inventions, applications, and any Intellectual Property rights granted. DuPont shall bear all costs involved.

**10.    Assignment.**
The Agreement shall not be assignable or otherwise transferable, in whole or in part, by Supplier.    The

Agreement shall be assignable or otherwise transferable in whole or in part by DuPont. The terms of these General Service Conditions shall be incorporated into all tier subcontracts.

**11.    Supplier Diversity.**
As required of DuPont by applicable law (e.g., 15 USCA 637) in the United States, and contracts to pass along (i.e., "flow down") to Supplier and to assist DuPont in complying with its corporate supplier diversity goals:

(a)    Supplier shall provide the maximum practicable opportunity to participate in the performance of the Agreement to the types of businesses categorized and defined by applicable law, the U.S. Small Business Administration and the National Minority Supplier Development Council (e.g., small business concerns, including the various types thereof, and minority owned businesses). Supplier shall carry this out in the awarding of subcontracts to such businesses to the fullest extent consistent with the efficient performance of the Agreement.

(b)    Supplier shall (i) report to DuPont, on a quarterly basis, the portion allocated to DuPont of the amounts paid by Supplier to such businesses or (ii) designate an individual who will provide such information to the DuPont Office of Supplier Diversity.

(c)    If required by the Small Business Act, Supplier shall cooperate in studies or surveys to determine compliance with this Section and shall adopt a subcontracting plan as described in such act.

**12.    Child and Forced Labor Prohibition.**
Supplier is fully aware of the DuPont Child and Forced Labor Principles ("DuPont Principles").  Supplier certifies that it does not and will not employ any person to perform services, provide product, or manufacture or supply material for DuPont who is under sixteen (16) years of age, or eighteen (18) years of age in the case of hazardous services or work (hereinafter "Child Labor"), unless Supplier first obtains the written approval of the Vice President of DuPont Sourcing & Logistics.

Supplier certifies that the workers it uses, and will use, to produce product, provide services, or manufacture or supply material are present voluntarily.  Supplier certifies that it does not and will not knowingly use forced labor as it is defined in the DuPont Principles.

Supplier understands that these certifications and undertakings are essential to the Agreement.  Supplier agrees to indemnify DuPont and hold DuPont harmless with respect to any liability arising from the contravention of this Section by Supplier.  Supplier also agrees that, in the event that DuPont determines that a violation of this Section has occurred, DuPont shall notify Supplier and Supplier shall immediately remedy the violation.  In the event that DuPont determines that Supplier has not remedied the violation, then DuPont may terminate the Agreement immediately, and such termination shall be with cause.

**13.    Safety and Health.**
Supplier shall:

(a)    comply with all federal, state, and local regulations, and all safety information and instructions as may be set forth in writing or otherwise provided by DuPont, as well as all Site rules and conditions.

- DuPont Confidential -

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

(b)  designate one (1) person to be responsible for carrying out Supplier's obligations under this Section;

(c)  promptly
    (i)  report to DuPont all incidents with potentially adverse safety, health or environmental implications, including slips, falls, equipment malfunctions, fume releases and any situation requiring first-aid or medical observation or treatment, and
    (ii)  include, whenever practicable, on-site DuPont medical personnel in the evaluation (by consultation, physical observation, or otherwise) of the involved employees of Supplier;

(d)  promptly report to DuPont all cases Supplier determines to be recordable on the OSHA 300 log or its equivalent and, upon request, provide DuPont with a copy of the OSHA 300 log and all supporting forms;

(e)  maintain an educational program to assure the inclusion of safety instructions as a part of job assignment; and

(f)  properly maintain, inspect, and supervise its designated work area and roadways to prevent unsafe work conditions from existing.  The responsibility includes Supplier's right and duty to conduct reasonable and necessary maintenance in the work area and of the roadways to prevent unsafe work conditions from existing.  Supplier shall regularly conduct safety audits and inspections to ensure compliance with its responsibility to maintain a reasonably safe work area.

Supplier must arrange for first-aid, emergency medical treatment, routine medical treatment, fitness for duty evaluations, drug testing, and other routine occupational medical services; although, upon request and in other appropriate circumstances, DuPont may provide first-aid and emergency medical treatment to stabilize Supplier's employees in connection with on-site incidents or medical emergencies.

If DuPont notifies Supplier of any noncompliance with the provisions of this Section, Supplier shall (immediately, if so directed; otherwise in not more than forty-eight (48) hours after receipt of such notice) make all reasonable efforts to correct the existing conditions.  If Supplier fails to correct the existing conditions, DuPont may suspend all or any part of the Services under the Agreement or may terminate the Agreement, without penalty, immediately upon written notice thereof to Supplier. In all other respects, such termination shall be in accordance with the other Sections of the Agreement. In the event Services are suspended, when satisfactory corrective action has been taken by Supplier, a start order shall be issued by DuPont. No part of the time lost due to any such work suspension shall be made the subject for claim for extension of time or for additional costs or damages by Supplier.

14.  Substance Abuse.
Supplier shall advise its employees and the employees of its subcontractors and agents that:

(a)  it is the policy of DuPont to prohibit use, possession, sale, manufacture, dispensing, and distribution of alcohol, drugs, or other controlled substances on a Site, and to prohibit in the workplace the presence of an individual with such substances in the body for non-medical reasons;

(b)  entry onto a Site constitutes consent to an inspection of the Supplier employee's person, vehicle, and personal effects when entering, while on, or upon leaving a Site; and

(c)  any Supplier employee who is found in violation of the policy or who refuses to permit inspection may be removed or barred from a Site at the discretion of DuPont.

Supplier, upon request of DuPont, shall not assign or reassign any employee to operations on a Site unless such employee has taken a drug and controlled substance test satisfactory to DuPont, and the test has proved negative for those drugs and controlled substances listed in the document titled "Minimally Acceptable Drug and Alcohol Testing", incorporated herein by reference, copies of which are available to Supplier from the DuPont Contract Administrator.

Supplier also, upon request of DuPont, shall develop and implement procedures, satisfactory to DuPont, to test its employees for alcohol, drug, and controlled substance use when Supplier suspects that a performance deviation, an incident, or unusual behavior of one (1) of Supplier's employees on a Site is related to drug or controlled substance use.

In connection with the above alcohol, drug, and controlled substance testing requirements, Supplier shall secure the written consent of its employees to release results of such tests to DuPont. DuPont shall use such test results only in connection with its decision to permit Supplier's employee to enter or remain on a Site, and to monitor contract compliance. Supplier shall ensure that all drug and controlled substance testing under this Section meets the minimum requirements set forth in the document titled "Minimally Acceptable Drug and Alcohol Testing".

All requirements of this Section shall apply only to the extent permitted by the law of the place where the Services are to be performed.

15.  Criminal Background Checks.
To the fullest extent permitted by law, prior to assigning any Supplier employee to perform any Services on a Site, Supplier shall have performed a criminal background check to determine whether such Supplier employee has been convicted of any felony or misdemeanor crime during the prior seven (7) year period, or has any known criminal convictions that occurred beyond the seven (7) year period. Supplier shall not, without the prior written approval of DuPont, permit a Supplier employee to perform Services on a Site if that Supplier employee has been convicted of any felony or misdemeanor crimes.  Supplier's criminal background check program must be in compliance with the Fair Credit Reporting Act and DuPont Contractor Criminal Background Investigation Requirements. In the event of an emergency, and only during the time such criminal background check is being performed, a Supplier employee may temporarily perform Services on a Site if such Supplier employee is escorted one hundred percent (100%) of the time by a DuPont employee.

16.  Authority.
The Parties hereby represent that they have full power and authority to enter into the Agreement and perform their respective obligations and duties hereunder, and do not know of any contracts, agreements, promises or undertakings that would prevent the full execution and performance of such obligations and duties.

Form Rev. February 7, 2005

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

Page 3

### 17. Working Arrangements.

DuPont will provide working space, and other services and materials, as DuPont deems appropriate, that may be necessary in connection with the performance of the Services on the Site described in the Agreement. Unless specifically requested by DuPont, Supplier's employees shall only provide Services during the normal working hours of DuPont. While on Site, Supplier's employees shall confine themselves to areas designated by DuPont. Supplier's employees will be subject to the badge and pass requirements of DuPont in effect at the site of the Services. Supplier shall also comply with all Site rules, regulations, and guidelines of whatever nature while performing Services at the Site.

### 18. License Grant.

For the term of the Agreement, any term extension, and any termination assistance period hereunder, Supplier hereby grants to DuPont (and DuPont Affiliates and Trading Partners) a fully paid-up, royalty free, worldwide, nonexclusive license to access and use the Services and any Supplier Intellectual Property necessary or appropriate to access and use the Services by an unlimited number of users in accordance with the Agreement (the "License"). The License includes the right: (a) to access and use Services for the benefit of DuPont, Affiliates, any Divested Businesses, and any Trading Parties; and (b) for third parties to access and use the Services, provided such access and use by third parties is to communicate, share or access information, or transact business between or with DuPont, Affiliates, Trading Partner or any Divested Businesses.

### 19. Compensation and Payment.

As full compensation for Services and other obligations under the Agreement, DuPont shall pay Supplier in accordance with the conditions and rates shown in the Price Schedule attached to the Agreement.

### 20. Payment Terms.

Terms of payment shall be net sixty (60) days after DuPont receives a properly prepared and correct Supplier invoice. Supplier's invoice shall be accompanied by such records or other written proof as DuPont deems adequate to verify the billings appearing therein or in a form as may be prescribed by DuPont's Contract Administrator. A properly prepared and correct invoice is an *original* document received at the proper DuPont address, as designated in an applicable purchase order, that clearly and legibly includes, as a minimum:

(a)  the DuPont Contract Order number and release number (if applicable);
(b)  Supplier's complete name and remit to address;
(c)  "bill to" stating the applicable DuPont entity;
(d)  a detailed description of the Services and/or Materials;
(e)  price, consistent with the Agreement;
(f)  quantity, consistent with the Agreement;
(g)  unit of measure, consistent with the Agreement;
(h)  Supplier's invoice number;
(i)  invoice date;
(j)  total monetary amount and currency base;
(k)  terms of payment, including any applicable discount calculations;
(l)  freight terms;
(m)  if applicable, tax amount/rate information; and
(n)  bill of lading number, rail car number or packing list number as appropriate.

Incomplete invoices shall be returned to Supplier unpaid and unprocessed.

If Supplier's invoice does not indicate that Supplier is an incorporated entity, by use of the words (or abbreviations) "Incorporated", "Corporation", or "P.C." as a part of Supplier's company name, then Supplier shall display its tax identification number (TIN) on the invoice in lieu of such designations. Failure to furnish such information may result in withholding appropriate amounts in accordance with IRS regulations.

Payment shall be considered made when payment checks are mailed by DuPont or when electronic funds transfer through the Automated Clearing House (EFT/ACH) is initiated by DuPont. Supplier's invoice shall be accompanied by such records or other written proof as DuPont deems adequate to verify the billings appearing therein.

Should payment not be received by Supplier as required hereunder, Supplier shall so notify DuPont. Thereafter, Supplier and DuPont shall have thirty (30) days to determine why payment was not received (or sent) and to take such steps as may be reasonably required to comply with these provisions and ensure ongoing compliance with the same.

### 21. Taxes.

Unless otherwise stated in the Agreement, DuPont shall pay value-added tax (VAT), Goods and Services Tax (GST), use, transfer, and similar taxes and surcharges (regardless of how they are denominated) levied by a taxing authority against or upon the goods and/or services (collectively, the "Taxes"). In the alternative, DuPont will provide Supplier with a certificate evidencing exemption of DuPont from payment of or liability for such Taxes. DuPont shall, without liability to Supplier, withhold income or other taxes from payments to Supplier to the extent that such withholding tax may be required by any taxing authority. In no event shall DuPont be responsible for Taxes based upon the net income or assets of Supplier, nor shall DuPont be responsible or liable for any penalties or interest due as a result of Supplier's failure to timely pay any Taxes attributable to the goods and/or services or to timely notify DuPont of such Taxes.

### 22. Lower Competitive Offer.

If at any time DuPont: (a) receives a bona fide offer from a third party to perform or provide comparable or superior Services, in whole or in part, under more favorable terms or at a lower total economic cost to DuPont, including all freight costs, for all or part of such Services performed hereunder; or (b) seeks competitive offers in the marketplace for Services, whether through a bid process or otherwise, and obtains a price and terms that DuPont determines separately or as a package offer lower overall cost to DuPont than the price and terms in effect hereunder, DuPont will notify Supplier of such offer and provide Supplier the opportunity to either be competitive or decline to do so. Supplier's opportunity to participate in the bid process constitutes Supplier's opportunity to exercise this competitive offer provision and be competitive. If Supplier declines to meet the competitive offer, DuPont has the right to purchase any or all Services from the unrelated third party supplier. Any purchases from the unrelated third party supplier shall reduce any amount DuPont is obligated to purchase hereunder.

### 23. Most Favored Nation.

Supplier shall not sell goods, materials, or products purchased under the Agreement nor provide services or comparable services, in whole or in part, to those covered herein, to third parties on better terms or at fees lower than

General Service Conditions

Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

those set forth herein, without offering such terms or fees to DuPont.

### 24.  Business Ethics.
Supplier shall not pay any salaries, commissions or fees (or make any other payments or rebates) to any employee, officer or director of DuPont (or any designee of such employee, officer or director) or favor any such individual with gifts, entertainment, services or goods.

### 25.  Records Retention and Site Visitation.
(a)  Supplier agrees to maintain, in accordance with generally accepted accounting principles and practices, such records as may be necessary to adequately reflect the accuracy of Supplier's charges and invoices under the Agreement, and to maintain such other additional records as DuPont may from time to time reasonably require. Supplier shall preserve such records for a minimum period of three (3) years from the date of last payment or completion of any relevant federal tax audit, without additional reimbursement or compensation therefore.

(b)  Upon notice from DuPont, Supplier shall provide DuPont, its agents and any of its regulators, accountants and auditors (collectively, the "DuPont Auditors") with access to, and any assistance and information that they may require with respect to, the Service locations and Services for purposes of auditing Supplier's compliance with the Agreement (including compliance with the DISO Standards) and the business of DuPont (including compliance with applicable law). If Supplier is notified that an audit identifies that:  (1) Supplier is not in compliance with the Agreement, Supplier shall promptly correct such non-compliance; or (2) DuPont is not in compliance with applicable law due to Supplier's acts or omissions, Supplier shall promptly correct such acts or omissions.

### 26.  Confidential Information.
(a)  Until the number of years set forth in the Agreement after the termination or expiration of the Agreement, any term extensions, and any termination assistance periods provided for in an addendum to these General Service Conditions, or in perpetuity in the case of trade secrets, Supplier shall not disclose to or permit to be used by (except in the furtherance of its responsibilities and obligations hereunder) any third party or entity any technical, commercial, organizational, scientific or business information, or Intellectual Property, of DuPont, Affiliates or Trading Partners, or any other information or Intellectual Property of DuPont or Affiliates designated as confidential at the time of disclosure, or if disclosed orally, designated orally as confidential at the time of disclosure and confirmed in writing within thirty (30) days after such disclosure (collectively "Confidential Information") disclosed to, learned by, or developed by it, its employees or agents under the Agreement.  In addition Supplier shall (i) not use the Confidential Information of DuPont other than to fulfill its obligations under the Agreement; (ii) not allow access to the Confidential Information to personnel who do not need access to such information in order to fulfill Supplier's obligations hereunder and; (iii) protect the Confidential Information with at least the same level of care as it uses for its own confidential information of a similar nature but not less than a reasonable level of care.

These restrictions on use and disclosure shall not apply to:

(i)   Confidential Information already known to Supplier when it was disclosed by DuPont as demonstrated by prior existing written records of Supplier;

(ii)  Confidential Information that is or becomes known to the public through no fault of Supplier, its employees, or agents;

(iii) Confidential Information that is lawfully received by Supplier from a third party where the third party has not required Supplier to maintain the information in confidence;

(iv)  Confidential Information developed by Supplier independently of disclosure by DuPont; and

(v)   Confidential Information required to be disclosed by court order or otherwise by applicable law.

(b)  The foregoing obligations of confidentiality also extend to and bind the employees, permitted subcontractors and agents of Supplier who have been provided access to Confidential Information by Supplier.

(c)  Upon request of DuPont, Supplier shall return to DuPont all Confidential Information and all written descriptive matter, including drawings, program listings, blueprints, descriptions, or other papers or documents, which contain or summarize any Confidential Information.

(d)  If the Parties have previously entered into a Confidential Information Agreement ("Other Agreement"), the terms of that Other Agreement shall take precedence over the terms of this Confidential Information Section with respect to information that is covered by both this Confidential Information Section and by the Other Agreement, but only to the extent that the Other Agreement offers greater protection for such items than the protection provided for in this Confidential Information Section.

(e)  The Agreement and its terms and conditions are considered Confidential Information.

### 27.  Unauthorized Acts.
Each Party shall:
(a)  promptly notify the other Party of any material unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information by any person or entity which may become known to such Party;

(b)  promptly furnish to the other Party full details of the unauthorized possession, use or knowledge, or attempt thereof, and assist the other Party in investigating or preventing the recurrence of any unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information;

(c)  cooperate with the other Party in any litigation and investigation against third parties deemed necessary by the other Party to protect its proprietary rights; and

(d)  promptly use its best efforts to prevent a recurrence of any such unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information.

Each Party shall bear the cost it incurs as a result of compliance with this Section.

### 28.  Compliance With Laws and Nondiscrimination.
Supplier shall comply with all applicable laws, ordinances, rules and regulations of governmental authorities, including any import and export control laws and regulations, and, in the United States, all applicable laws, ordinances, rules and regulations covering the production, sale and delivery of the Services, including the Equal Opportunity Clause prescribed in 41 CFR 60-1.4; the Affirmative Action Clause prescribed in 41 CFR 60-250.4, regarding disabled veterans and

- DuPont Confidential -

Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

veterans of the Vietnam Era; the Affirmative Action Clause for Handicapped Workers prescribed in 41 CFR 60-741.4; 48 CFR Chapter 1 Subpart 19.7 regarding Small Business and Small Disadvantaged Business Concerns; Affirmative Action Compliance Program (41 CFR 60-1.40); the annual filing of SF-100 Employer Information Report (41 CFR 60-1.7); 41 CFR 60-1.8 prohibiting segregated facilities; the Fair Labor Standards Act of 1938, as amended; the Sarbanes-Oxley Act of 2002, Section 303 and Securities Exchange Act of 1934, as amended, Rule 13b2-2.

### 29. Representations and Warranties.

Supplier represents and warrants:

(a) All obligations shall be performed in a prompt and professional manner in accordance with industry standards and the Agreement (including any milestones, service levels, or dates set forth therein), free of errors or defects in design, material and workmanship.

(b) It owns all right, title, and interest in and to, or has sufficient right, title, and interest in, the Services and Supplier Intellectual Property to provide the Services as set forth in the Agreement and to convey to DuPont the Licenses set forth in the License Grant Section and assign the ownership rights pursuant to the Work Product and Title Section herein.

(c) In the event of breach of the warranties set forth in this Representations and Warranties Section, Supplier, at its expense, shall correct (by repair, replacement or re-performance) such breach as soon as possible, but not more than ten (10) days after notice from DuPont. If the breach is not so corrected, then DuPont, at its option, may either: (i) extend the time for Supplier to correct such breach, if correction is commercially reasonable; (ii) negotiate an appropriate reduction in or refund of Supplier's compensation; or (iii) terminate the Agreement, in which case, in addition to any other right or remedy DuPont may have, Supplier shall immediately refund to DuPont all amounts paid hereunder. If DuPont selects option (i) but the breach is still not corrected within the extended time, DuPont shall have the same options again.

(d) EXCEPT AS PROVIDED IN THE AGREEMENT, SUPPLIER MAKES NO IMPLIED WARRANTIES REGARDING THE SERVICES AND SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

### 30. General Indemnity.

Each Party ("Indemnitor") shall, to the extent permitted by law, indemnify, defend and hold harmless the other Party from and against any and all claims, demands, complaints or actions of third parties (including employees of the Parties or government agencies) arising from or relating to the Agreement (including personal injury, death, property damage or damage to the environment), to the extent caused or arising out of the negligence, willful misconduct, breach of this Agreement or a related agreement, or violation of law of or by the Indemnitor or any subcontractor of the Indemnitor. Further, in the event the Parties are jointly at fault or negligent, they agree to indemnify each other in proportion to their relative fault or negligence. The claims, demands, complaints and actions covered hereunder include all settlements, losses, liabilities, judgments, court costs, reasonable attorneys' fees, fines, penalties and other litigation costs and expenses arising from or related to such claims, demands, complaints or actions.

### 31. Infringement Indemnity By Supplier.

Supplier will indemnify, defend and hold harmless DuPont from and against any and all claims, demands, complaints, or actions of third parties (including employees of the Parties or government agencies) arising from or relating to the Agreement brought against DuPont alleging that the Service or use of Supplier Intellectual Property infringes any patent, copyright, trade secret or other intellectual property right. The claims, demands, complaints and actions covered hereunder include all settlements, losses, liabilities, judgments, court costs, reasonable attorneys' fees, fines, penalties and other litigation costs and expenses arising from or related to such claims, demands, complaints or actions.

If such a claim is brought against DuPont, DuPont shall give prompt written notice thereof to the Supplier. At Supplier's cost, (a) Supplier shall immediately take control of the defense of such claim and shall engage attorneys acceptable to DuPont to defend such claim and (b) DuPont shall cooperate with Supplier (and its attorneys) in the defense of such claim, provided, however, that DuPont may, at its own cost, participate (through its attorneys or otherwise) in such defense. No settlement of a claim that involves a remedy other than the payment of money by the Supplier shall be entered into without the consent of DuPont. If Supplier does not assume control over the defense of a claim as provided in this Section, DuPont may defend the claim in such manner as it may deem appropriate, at the cost of the Supplier. Should use of the Service or Supplier Intellectual Property become, or in the opinion of Supplier be likely to become, the subject of such an infringement claim, Supplier may, at its expense and option, (i) procure for DuPont the right to continue using or receiving the Service or Supplier Intellectual Property free of any liability, or (ii) replace or modify, in whole or in part, the Services or Supplier Intellectual Property to make them non-infringing without degradation.

### 32. Insurance.

(a) Supplier, at its expense, shall carry and maintain in force at all times relevant hereto the following insurance, on policy forms and with insurance companies authorized to do business in the jurisdiction(s) where work is to be performed and acceptable to DuPont, at the indicated minimum coverage limits, or such higher limits as DuPont may require, or the limits provided under insurance currently held by Supplier as of the Effective Date of the Agreement, whichever is greater.

(i)     Workers' Compensation - Statutory; Employer's Liability - $500,000 per accident/per employee; and such other insurance as may be required by Statutory law. This policy shall include a waiver of subrogation to DuPont.

(ii)     Commercial General Liability (Occurrence Form), including Contractual Liability and liability for Products and Completed Operations, in a combined limit for Bodily Injury and Property Damage - $1,000,000 per occurrence. This policy shall name DuPont as additional insured.

(iii)     Business Automobile Liability, in a combined single limit for Bodily Injury and Property Damage - $1,000,000 per occurrence.

(iv)     Other insurance appropriate for Supplier's business or as required by law.

- DuPont Confidential -

Form Rev. February 7, 2005

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

(b) Supplier shall maintain in force the insurance required by this Section and shall seasonably renew all required coverage during the term of the Agreement.

(c) Upon the request of DuPont, Supplier shall provide DuPont with certificates of insurance evidencing the coverage. Such certificates shall provide that the insurer will give DuPont at least thirty (30) days advance notice of any changes in, or cancellation or non-renewal of, coverage and note any exclusions. If, in connection with the performance of Services under the Agreement, Supplier will not use motor vehicles on the Site other than parking areas, a letter so stating is acceptable in lieu of the automobile insurance certificate.

(d) Supplier shall require that any subcontractor it employs carry the same coverage in the same limits as set out above, and other coverage as Supplier deems appropriate and shall provide proof.

(e) Neither failure of Supplier to comply with any or all of the insurance Sections of the Agreement, nor the failure to secure endorsements on policies as may be necessary to carry out the terms and Sections of the Agreement, shall be construed to limit or relieve Supplier from any of its obligations under the Agreement, including the Insurance Section.

**33. Term.**
The Agreement shall commence as of the Effective Date on the contract order and shall continue in full force and effect for the period set forth in the Agreement unless earlier terminated in whole or in part, as set forth herein: (i) in accordance with the Insolvency; Reorganization Section or other Sections hereof; or (ii) by DuPont, at any time, without cause, upon thirty (30) days prior notice. Termination pursuant to (ii) shall be accomplished without penalty, and shall not relieve or release either DuPont or Supplier from any rights, liabilities or obligations that have accrued under the law or the Agreement prior to the date of such termination. Supplier shall immediately cease work upon receipt of any notice of termination from DuPont, unless otherwise specified by DuPont in the notice. DuPont will have the right and option, but not the obligation, to extend the Agreement for an additional number of consecutive one (1) year periods as set forth in the Agreement after the expiration of the initial term or any term extension by providing Supplier with at least thirty (30) days notice thereof prior to the expiration date of the initial term or any term extension, as appropriate.

**34. Replacement of Prior Agreements.**
The Agreement shall take the place of and entirely supersede any oral or written contracts, agreements, or arrangements that deal with the same subject matter as referenced herein between DuPont and Supplier and set forth in the contract order except for any rights, obligations and liabilities which by the terms of that agreement or the law survive its expiration, termination or cancellation.

**35. Termination for Cause.**
Either Party may terminate the Agreement if the other Party has materially breached its obligations under the Agreement and fails to correct the breach within thirty (30) days after the defaulting Party's receipt of notice of such breach. The non-defaulting Party also may exercise any other rights available to it at law or in equity.

**36. Insolvency; Reorganization.**
If Supplier shall: (i) dissolve, transfer, sell, assign, mortgage, encumber, pledge, or otherwise dispose of substantially all of its assets used to perform its obligations hereunder, its accounts receivable from DuPont or over twenty percent (20%) of its ownership or controlling interest (whether in the form of stock or otherwise); (ii) consolidate with or merge into another corporation or permit one (1) or more other corporations to consolidate with or merge into it; (iii) be adjudged bankrupt, make a general assignment for the benefit of its creditors or become insolvent and a receiver shall therefore be appointed; or (iv) contemplate or reasonably expect the occurrence of any event referred to in this Section; then in each case, Supplier shall give DuPont notice of such occurrence as soon as is legally permissible. If such occurrence or proposed occurrence is unacceptable to DuPont, DuPont may terminate the Agreement immediately upon notice thereof to Supplier. Such termination shall be considered termination for cause.

**37. Payment upon Termination.**
In the event of termination of the Agreement, for any reason other than a breach and default by DuPont, Supplier shall only be entitled to payment for Services properly performed in accordance with the Agreement prior to the effective date of termination.

**38. Force Majeure.**
If, and to the extent, that performance by a Party (the "Affected Party") of any of its obligations under the Agreement is prevented, hindered or delayed by fire, flood, earthquakes, other elements of nature or acts of God, acts of war, terrorism, riots, rebellions or revolutions, civil disorders or third party labor strikes or disputes (excluding those involving a Party's agents or other contractors) (each a "Force Majeure Event"), then the Affected Party shall be excused for such non-performance, hindrance or delay for as long as such Force Majeure Event continues; provided, however: (1) such Force Majeure Event is beyond the reasonable control of the Affected Party and could not be prevented by reasonable precautions; and (2) the Affected Party is diligently attempting to recommence performance (including through alternate means). The Affected Party shall immediately notify the other Party of the occurrence of the Force Majeure Event and describe the Force Majeure Event in reasonable detail. If the Affected Party does not remove or work around the Force Majeure Event within fifteen (15) days, then DuPont (if Supplier is the Affected Party) or Supplier (if DuPont is the Affected Party) may terminate the Agreement (or affected portion) as of the date (including immediately) specified by such Party in a termination notice to the affected Party.

**39. Applicable Law and Jurisdiction.**
The Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law. The Agreement shall not be governed by the U.N. Convention on Contracts for the International Sale of Goods. The Parties consent and submit exclusively to the jurisdiction and service of process of the courts of the State of Delaware or the courts of the United States located in Delaware.

**40. Separate Contracts.**
DuPont reserves the right to enter into other agreements in connection with the Services. Supplier shall afford other contractors and DuPont reasonable opportunity for introducing and storing their materials and equipment and for performing their services. Supplier shall properly cooperate, connect and coordinate the performance of the Services with

- DuPont Confidential -

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

that of other services as shall be in the best interest of the project as determined by DuPont.

### 41. Severability.
In the event that any Section of the Agreement shall be found to be void or unenforceable, such findings shall not be construed to render any other Section of the Agreement either void or unenforceable, and all other sections shall remain in full force and effect unless the Section(s) which is/are invalid or unenforceable shall substantially affect the rights or obligations granted to or undertaken by either Party.

### 42. Reservation of Rights.
Either Party's waiver of any of its remedies afforded hereunder or by law is without prejudice and shall not operate to waive any other remedies either Party shall have available to it, nor shall such waiver operate to waive either Party's rights to any remedies due to a future breach, whether of a like or different character. Furthermore, any termination of the Agreement shall not relieve or release either Party hereto from any rights, liabilities, or obligations, which it has accrued under law or under the terms of the Agreement prior to the date of such termination.

### 43. Publicity and Corporate Identity.
Supplier shall not use the name, tradename, oval, trademarks, service marks or logos of DuPont (DuPont Trademarks) in any publicity releases, news releases, annual reports, product packaging, signage, stationery, print literature, advertising or websites without securing the prior written consent of DuPont Sourcing & Logistics. Supplier shall not, without prior written consent of DuPont, represent, directly or indirectly, that any product or service offered by Supplier, has been approved or endorsed by DuPont. Any DuPont Trademarks that Supplier is given consent to use must always be reproduced distinctively, accurately and consistently and as specified by DuPont. DuPont reserves the right to review and provide final approval of any material produced with approved use of the DuPont Trademarks.

### 44. Contract Administrator.
The Contract Administrator will represent DuPont in the administrative phases of the Services. The Contract Administrator shall maintain an interface with Supplier and shall keep the procurement personnel of DuPont informed at all times of the adequacy of Supplier's performance and progress. In the performance of this assignment, the Contract Administrator shall have no legal right to authorize changes of any kind that are outside the scope and compensation of the Agreement, nor shall the Contract Administrator's actions be construed as giving implied approval of any such change. Except as otherwise specifically provided herein, such changes shall be effected only by a written modification to the Agreement. The DuPont and Supplier Contract Administrators for the Agreement are set forth in the Agreement

### 45. Notices.
All notices and consents required under the Agreement shall be in writing or by facsimile machine confirmed in writing by the next business day. Written notices shall be effective if delivered by hand to the Party entitled to receive the same, or if sent by registered or certified mail, postage prepaid, or by confirmed courier to such Party at the address stated in the Agreement for the receipt of notices or at such other address as directed by written notice hereunder from time to time; and if no such address is stated or directed, if addressed to such Party at the address stated in the Agreement as being the address of such Party. If a provision in the Agreement requires notice within a stated number of

days, such days shall be calendar days unless business days are specified.

Notices, invoices and other correspondence, information, documentation or payment shall be made and provided as set forth in the Agreement. Either Party may change its address for notice hereunder upon no less than thirty (30) days prior written notice thereof to the other Party.

### 46. Alternate Dispute Resolution.
(a)   Both Parties understand and appreciate that their long term mutual interests will be best served by affecting a rapid and fair resolution of any claims or disputes that may arise out of the Agreement. Therefore, both Parties agree to use their commercially reasonable efforts to resolve all such disputes as rapidly as possible on a fair and equitable basis. Toward this end both Parties agree to develop and follow a process for presenting, rapidly assessing, and settling claims on a fair and equitable basis. If any dispute or claim arising under the Agreement cannot be readily resolved by the Parties pursuant to the process referenced in this subsection (a), the Parties agree to refer the matter to a panel consisting of one (1) executive, from each Party, not directly involved in the claim or dispute for review or resolution. A copy of the contract terms, agreed upon facts (and areas of disagreement) and concise summary of the basis for each side's contentions will be provided to both executives who shall review the same, confer and attempt to reach a mutual resolution of the issue.

(b)   If the dispute cannot be resolved under the process set forth in subsection (a), the Parties may elect to resolve the dispute through non-binding mediation. If mediation is to be utilized, the Parties shall select a single unrelated but qualified mediator who shall hold a hearing (not to exceed one (1) day) during which each Party shall present its version of the facts (supported, if desired, by sworn, written testimony, and other relevant documents), its assessment of damages and its argument. The Parties shall provide the mediator with a copy of the Agreement and copies of all documents provided to their executives under subsection (a) at least ten (10) days prior to the scheduled date of the mediation hearing.   The Parties may also provide the mediator with copies of any laws or regulations that they feel are relevant to the dispute.   Formal written arguments, legal memoranda and live testimony are discouraged but may be permitted at the discretion of the mediator.   Both Parties agree to use commercially reasonable efforts, make any involved employees or documents available to the other Party for its review and use in preparing its position under this Section without the need for subpoena or other court order.

(c)   The mediator, within fifteen (15) days of the completion of the hearing, will meet with both Parties and provide each of them, on a confidential basis, with his written views of the strengths and weaknesses of their respective positions. The Parties will then reconvene and, with the assistance of the mediator, attempt to resolve the matter. If resolution cannot be achieved by the Parties within forty-eight (48) hours of this second meeting, the mediator, within fifteen (15) additional days, will issue a written, nonbinding decision on the issue.

(d)   If the matter has not been resolved utilizing the processes set forth in this Section and the Parties are unwilling to accept the nonbinding decision of the mediator, either or both Parties may elect to pursue resolution through litigation.

- DuPont Confidential -

Form Rev. February 7, 2005

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

Page 8

(e)  The costs of the mediator shall be borne by the losing Party (determined at mediation or through subsequent litigation). Each Party will bear its own additional costs of mediation.

(f)  If a settlement is reached in a case in which joint liability is alleged, the Parties, subsequent to settlement, shall utilize this Alternate Dispute Resolution procedure to determine the proportion of relative fault.

### 47.  Privacy.

Supplier shall comply with all aspects of the DuPont Privacy Policy as set forth at http://www.dupont.com/corp/global_privacy.html (or any subsequent site from time to time designated in writing by DuPont), including the execution of the DuPont form Personal Information Transfer Agreement, if applicable, as reasonably determined by DuPont. Unless agreed otherwise in writing, any personally identifiable information provided by one (1) Party to the other hereunder may only be used for conducting the business transaction(s) that is the subject of the Agreement. DuPont does not consent to Supplier's use of any personally identifiable information provided by DuPont, its subcontractor, affiliate, customer, vendor, or employee, for any direct marketing, nor to the transfer of such information to any third party.

### 48.  Buy DuPont.

It is DuPont policy to preferentially purchase DuPont products, components, ingredients, services, and technology. In fulfilling the Agreement and in support of the above stated policy, Supplier shall use its best efforts to furnish or specify products that, to the fullest extent possible, incorporate materials manufactured by DuPont, if such materials are suitable for the use intended.

### 49.  Changes.

(a)  DuPont, by written direction, may make changes in the Services, which shall be performed under the applicable conditions of the Agreement. Such changes may include (i) addition to or deletion of any part of the Services, including increase or decrease of quantities of Services and addition of new Services, (ii) alteration of specifications and/or design, (iii) alteration of DuPont-provided facilities, equipment, materials, services or sites, or (iv) orders for Supplier to accelerate or delay the performance of Services.

(b)  All changes in Services must be authorized in writing by DuPont before such Service is begun.

(c)  If DuPont and Supplier are unable to agree that an item of Service constitutes a change, or that Supplier is entitled to additional compensation and/or an extension of time for such item of Service, Supplier, upon receipt of a written order signed by DuPont, shall promptly proceed with, and expeditiously perform and/or supply, the item of Service, and shall submit a claim therefore as provided herein below.

(d)  In the event DuPont orders completion of Services being provided on a lump sum basis to be delayed or accelerated, adjustment of Supplier's compensation shall be determined by mutual agreement of the Parties based on Supplier's submission of a written estimate of the cost of the delay or acceleration. DuPont reserves the right, however, to reimburse Supplier for delays on an actual cost basis, in which case Supplier shall document such delays daily. Daily documentation shall include identification of the activities, type and number of workers, and type and quantities of materials and equipment affected by the delay.

(e)  Supplier shall provide, with its price proposal for all proposed changes in Services, such supporting documentation as DuPont may require to evaluate the proposal.

(f)  If the Parties are unable to agree on the amount by which the total amount of the Agreement should be adjusted for a change in Services, DuPont shall provide written notification to Supplier of the adjustment DuPont considers appropriate therefore, and such adjustment shall be effective subject to Supplier's right to submit a claim as provided herein below.

(g)  Any claim by Supplier for an adjustment of its compensation or schedule, or in opposition to an adjustment imposed by DuPont through notice as provided herein above, shall be submitted to DuPont in writing by Supplier within fifteen (15) days of commencement of the event giving rise to such claim, or in the case of an adjustment imposed by DuPont through notice as provided herein above, within fifteen (15) days of Supplier's receipt of such notice. Supplier shall submit to DuPont, in writing, the amount or extent of the claim with supporting data within sixty (60) days of completion of the Services or termination of the event for which it claims an adjustment of its compensation or schedule (unless DuPont allows additional time for Supplier to obtain more accurate cost or other data). Such claim shall be resolved through dispute resolution as provided in the Alternate Dispute Resolution Section hereof. No claim by Supplier shall be valid unless submitted in accordance with this Section.

Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

# **EXHIBIT C**

**DUPONT** **E. I. du Pont de Nemours and Company**

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
1423 E FIRST ST
HUMBLE TX   77338

**Purchase order**

PO number/date
4500405916 / 03 Nov 2005
Contact person/Telephone
Fields, Kathy/502 775-3013
Our fax number
502 775-3032

Your person responsible
Justin Lecourias

Please enter our order as specified below subject to terms and conditions
listed on both the face and/or reverse side of this purchase order. Any
additional or different terms in seller's form(s) are material alterations and
are hereby rejected.
1. If price, terms, and required receiving date or other conditions and instructions
are not acceptable immediately advise buyer shown below.
2. Furnish complete shipping information and include 2 copies of packing list
with each shipment. Show purchase order number / release number on each
package, packing list, invoice, bill of lading, and all correspondence.

Your vendor number with us
8015960

Please deliver to:                        Delivery date:      27 Oct 2005
LOUISVILLE WORKS MFGG 2350 C5
4131
4200 CAMP GROUND RD.
LOUISVILLE KY  40216-4602

Mail your invoice to address indicated below:
E I DuPont de Nemours and Co., Inc.
Nashville Payment Center
P.O.Box 367
Old Hickory, TN 37138-0367

Terms of deliv.: 000 - Delivery terms do not apply
Terms of payt.: Net 60 days from date of invoice
Currency:       USD

Please ignore the address above and mail invoices to the Louisville
address listed below.  Should you have any questions, contact Kathy
Fields 502-775-3013.
*************************************************************
For On-Site Contracted Services and Off-Site Repair Services send
invoices to:
DuPont Louisville Works
Attn:  Kari Joplin
P.O. Box 16350
Louisville, KY 40256
*************************************************************
Attachements:  Site Conditions dated July 26, 2005 and General Terms
and Conditions dated Feb. 7, 2005

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

Case 1:07-cv-0034 E.-I. Bu Pont de Nemours and Company Page 3 of 3

**DUPONT**

E. I. du Pont de Nemours and Company
WILMINGTON, DE 19898 U.S.A

| | | |
|---|---|---|
| MECHANICAL INTEGRITY INC | PO number/date | Page |
| 1423 E FIRST ST | 4500405916 / 03 Nov 2005 | 2 / 2 |
| HUMBLE TX  77338 | | |

| Item | Material | Description | | |
|---|---|---|---|---|
| | Order qty. | Unit | Price per unit | Net value |

| | | | | |
|---|---|---|---|---|
| 00010 | | OUTSIDE INSPECTION OF CHCL3 HEADER | | |
| | 1.000 | Perf Unit | 14,000.00 | 14,000.00 |

OUTSIDE INSPECTION OF CHCL3 HEADER
THIS IS TO BE DONE BY OUTSIDE VENDOR. THE VENDOR OF RECORD IS
GUIDED ULTRASONICS. I WILL FAX YOU THEIR QUOTE TO HAROLD
SKIDMORE. IF YOU NEED MORE INFORMATION PLEASE CONTACT HAROLD AT
3286.
THE PRICE OF $12,935 IS TO INCLUDE LABOR/EQUIPMENT CHARGES AND
EXCLUDES AIRFARE AND FREIGHT.
THIS WORK IS TO BE SCHEDULED DURING DPE OUTAGE SOMETIME AROUND
THE 14TH OF NOV. PER HAROLD.
Expected value of unplanned services:        14,000.00

    Total net item value excluding tax USD          14,000.00

Send Collect freight invoices for  US  domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

# **EXHIBIT D**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. _____ |
| v. | ) ) | Jury Trial Demanded |
| MECHANICAL INTEGRITY, INC., | ) ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff E. I. du Pont de Nemours and Company ("DuPont"), as and for its complaint

against Defendant Mechanical Integrity Inc. ("MI" or "Defendant"), alleges as follows:

### Nature of the Action

1.    This is an action for breach of contract, misrepresentation and fraud, based upon a

March 2004 contract between DuPont and MI.  Pursuant to that contract, Defendant MI was

required to perform an inspection of approximately 3,600 feet of pipeline used to carry

chloroform to DuPont's Louisville, Kentucky facility.  Due to MI's failure to properly conduct

the inspection, a serious leak in the pipeline caused a chloroform leak and DuPont was forced to

expend over $2,000,000.00 to remediate the area where the leak occurred.

### The Parties

2.    Plaintiff DuPont is a Delaware corporation with its principal place of business

located at 1007 Market Street, Wilmington, Delaware 19898.

3.    Defendant MI is a Texas corporation with its principal place of business located at

1423 First Street, Suite A, Humble, Texas 77338.

Jurisdiction And Venue

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332, because diversity of citizenship exists between the plaintiff and defendant, and the

damages DuPont has sustained exceed $75,000.

5.      The Court has personal jurisdiction over the defendant pursuant to 10 *Del. C.* §

3104, because the parties' contract contains a provision whereby MI  consented and submitted

exclusively to the jurisdiction and service of process of the courts of the State of Delaware or the

courts of the United States located in Delaware.  (Ex. A ¶ 39).

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because the

defendant is subject to personal jurisdiction in this District.

Facts

7.      DuPont's Plant in Louisville Kentucky manufactures neoprene, or synthetic

rubber, as well as ozone-safe, non-chlorofluorocarbon substitutes such as Suva® refrigerants and

Dymel® propellants.

8.      On or about February 2, 2004, DuPont and MI entered into a contract, Purchase

Order No. 4500104098, whereby MI agreed to perform a "guided wave" ultrasonic inspection on

a four-inch diameter chloroform pipeline supplying the Louisville Plant.  (P.O. No. 4500104098

is attached hereto as Exhibit A.)  The Purchase Order expressly attached and incorporated

DuPont's General Conditions.  (Ex. A.)  Together, the Purchase Order and the General

Conditions comprise the contract between DuPont and MI (the "Contract").

9.      The pipeline which was to be inspected is approximately 3,600 feet long and is

used to transport chloroform, a potentially environmentally hazardous material, from a

contracted storage facility to the Louisville Plant.

2

10.     A portion of the pipeline traverses an adjacent site owned by Rohm and Haas Company, where it is routed under several road and railroad track crossings. Because these crossings prevent conventional inspection protocols from being used to assess the pipeline's condition, DuPont contracted with MI to utilize long-range ultrasonic technology as a screening tool to locate and characterize any defects in the pipeline.

11.     MI was aware that one of the purposes of the inspection was for DuPont to identify repair work that needed to be performed on the pipeline during the scheduled Louisville Plant shutdown in April 2004.

12.     MI conducted its inspection from March 31 through April 1, 2004, and was paid $13,429.97 by DuPont for these services.

13.     Following its inspection, MI issued an Inspection Report detailing its findings. (The "Report" which is attached as Ex. B.) The Report divided the pipeline into fifteen sections for purposes of the inspection and placed each section into one of three categories. A designation of Category 1 meant that the pipeline had less than 20% wall loss; Category 2 meant there was 20% to 50% wall loss, and Category 3 meant greater than 50% wall loss. Eleven of the sections were deemed by MI to fall into Category 1 and showed "no significant areas of concern"; four sections were deemed by MI to be Category 2 with "minor indications" of wall loss on the pipeline, and no section was designated by MI as being so deteriorated as to fall into Category 3.

14.     In reliance on MI's Inspection Report, in April 2004 DuPont repaired two of the areas of the pipeline that MI had designated as "Category 2," which showed some evidence of corrosion.

15.     On November 3, 2005, DuPont entered into another contract with MI, Purchase Order No. 4500405916, to perform a follow-up inspection of the pipeline. (Purchase Order No. 4500405916 is attached as Ex. C.) That inspection was scheduled to take place November 17-19, 2005.

16.     On November 18, 2005, a chloroform leak was discovered on a section of the pipeline that was previously inspected by MI and/or which MI reported to be within Category 1 and having "no significant areas of concern." The leak was found beneath a road crossing on the Rohm and Haas site.

17.     Because chloroform is a toxic material, as soon as the leak was observed, DuPont immediately initiated emergency response procedures and shut down the Louisville Plant's operations in an attempt to mitigate the leak. Despite DuPont's swift response, contamination of the soil and surface water could not be prevented.

18.     As a result of the chloroform leak, DuPont had to expend over $2,029,462.21 to remediate the soil and surface water adjacent to the spill location, as well as repair the pipeline.

19.     The external condition of the pipeline was so deteriorated that the corrosion of the pipe wall had to have been present, in a substantial degree, in March of 2004. Thus, MI's 2004 Inspection Report misrepresented the integrity of that section of the pipeline.

20.     When confronted with this discrepancy, MI admitted that, contrary to its Inspection Report, it did not inspect the area of the pipe where the leak occurred.

21.     Had MI properly inspected the area of the pipeline where the leak occurred, and reported its deteriorated condition to DuPont, DuPont would have immediately repaired the pipe, as was done with the pipe sections designated as Category 2. Thus, the chloroform leak would have been avoided.

4

22.    MI's failure to adequately inspect the pipeline and/or truthfully report its conduct to DuPont directly caused to the failure of the pipe wall and the resultant leak of chloroform.

## COUNT I:  BREACH OF CONTRACT

23.    DuPont repeats and realleges paragraphs 1 through 22 above as if fully set forth herein.

24.    Defendant MI is bound by the terms of the Contract, which required it to inspect all 3,600 feet of the pipeline specifically identified in the Contract, and accurately report its findings.

25.    MI breached its obligation by failing to adequately inspect the area of the pipeline where the leak occurred, and/or by reporting, inaccurately, that the pipe was in good condition at that location.

26.    As a result of MI's breach of the terms of the Contract, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT II:  FRAUD
### (Pled in the Alternative)

27.    DuPont repeats and realleges paragraphs 1 through 26 above as if fully set forth herein.

28.    By virtue of the parties' Contract, MI had a duty to truthfully disclose the scope and results of its inspection of the pipeline.

29.    MI's Inspection Report falsely represented the condition of the pipeline where the leak occurred or, at the very least, omitted the fact that MI did not properly inspect the subject area of the pipeline.

30.    MI knew that the misrepresentations contained in the Inspection Report were false, and/or made the misrepresentation with reckless indifference to its truth.

5

31.     MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline and, by issuing a false Inspection Report, MI intended to induce DuPont to refrain from conducting all necessary repairs.

32.     DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

33.     As a result of its reliance on the false report, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT III:  INTENTIONAL MISREPRESENTATION
### (Pled in the Alternative)

34.     DuPont repeats and realleges paragraphs 1 through 33 above as if fully set forth herein.

35.     MI deliberately concealed the fact that it did not inspect the area of the pipeline where the leak occurred and/or failed to accurately report the condition of the pipeline, despite its obligation to do so.

36.     The condition of the pipeline at all points along the 3,600 foot corridor was material, and, indeed, constituted the sole purpose of the parties' contract.

37.     MI acted with scienter because it knew that its Inspection Report contained false information about the integrity of the pipeline.

38.     MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline.  By issuing a false Inspection Report, MI intended to induce DuPont to refrain from conducting all necessary repairs.

39.     DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

6

40.    As a result of MI's concealment, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT IV:   NEGLIGENT MISREPRESENTATION
### (Pled in the Alternative)

41.    DuPont repeats and realleges paragraphs 1 through 40 above as if fully set forth herein.

42.    By virtue of the parties' Contract, MI had a duty to truthfully disclose the scope and results of its inspection of the pipeline.

43.    MI's Inspection Report falsely represented the condition of the pipeline where the leak occurred or, at the very least, omitted the fact that MI did not properly inspect the subject area of the pipeline.

44.    MI failed to exercise reasonable care in conducting its inspection and in communicating the results of its inspection to DuPont.

45.    MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline.

46.    DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

47.    As a result of its justifiable reliance on the false report, DuPont has suffered damages in excess of $2,000,000.00.

## PRAYER FOR RELIEF

DuPont respectfully requests that this Court enter judgment in favor of DuPont, as follows:

(a)  against defendant MI for damages in the amount of at least $2,029,462.21;

7

(b)  against defendant MI for pre- and post-judgment interest on the sum of all damages awarded to DuPont against the defendant;

(c)  against defendant MI for punitive damages based on its reckless and/or intentional conduct;

(d)  against defendant MI for the fees and costs incurred in asserting this action, including attorneys' fees; and

(d)  such other and further relief the Court may deem just and proper.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _____
    Kathleen Furey McDonough (I.D. # 2395)
    Sarah E. DiLuzio (I.D. # 4085)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, Delaware  19801
    Telephone: (302) 984-6000

*Attorneys for Plaintiff*
*E. I. du Pont de Nemours and Company*

Dated: June 1, 2007
790808v4/20120-435

8

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) ) | |
| | ) | C.A. No. 07-346 SLR |
| Plaintiff, | ) ) | |
| v. | ) ) | Jury Trial Demanded |
| MECHANICAL INTEGRITY, INC., | ) ) | |
| Defendant. | ) | |

### AMENDED COMPLAINT

Plaintiff E. I. du Pont de Nemours and Company ("DuPont"), as and for its amended complaint against Defendant Mechanical Integrity Inc. ("MI" or "Defendant"), alleges as follows:

### Nature of the Action

1.    This is an action for breach of contract, misrepresentation and fraud, based upon a March 2004 contract between DuPont and MI. Pursuant to that contract, Defendant MI was required to perform an inspection of approximately 3,600 feet of pipeline used to carry chloroform to DuPont's Louisville, Kentucky facility. Due to MI's failure to properly conduct the inspection, a serious leak in the pipeline caused a chloroform leak and DuPont was forced to expend over $2,000,000.00 to remediate the area where the leak occurred.

### The Parties

2.    Plaintiff DuPont is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19898.

3.    Defendant MI is a Texas corporation with its principal place of business located at 1423 First Street, Suite A, Humble, Texas 77338.

Jurisdiction And Venue

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332, because diversity of citizenship exists between the plaintiff and defendant, and the

damages DuPont has sustained exceed $75,000.

5.     The Court has personal jurisdiction over the defendant pursuant to 10 *Del. C.* §

3104, because the parties' contract contains a provision whereby MI consented and submitted

exclusively to the jurisdiction and service of process of the courts of the State of Delaware or the

courts of the United States located in Delaware.  (Ex. A ¶ 39).

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because the

defendant is subject to personal jurisdiction in this District.

Facts

7.     DuPont's Plant in Louisville Kentucky manufactures neoprene, or synthetic

rubber, as well as ozone-safe, non-chlorofluorocarbon substitutes such as Suva® refrigerants and

Dymel® propellants.

8.     On or about February 2, 2004, DuPont and MI entered into a contract, Purchase

Order No. 4500104098, whereby MI agreed to perform a "guided wave" ultrasonic inspection on

a four-inch diameter chloroform pipeline supplying the Louisville Plant.  (P.O. No. 4500104098

is attached hereto as Exhibit A.)  The Purchase Order expressly attached and incorporated

DuPont's General Conditions.  (Ex. A.)  Together, the Purchase Order and the General

Conditions comprise the contract between DuPont and MI (the "Contract").

2

9.     The pipeline which was to be inspected is approximately 3,600 feet long and is used to transport chloroform, a potentially environmentally hazardous material, from a contracted storage facility to the Louisville Plant.

10.     A portion of the pipeline traverses an adjacent site owned by Rohm and Haas Company, where it is routed under several road and railroad track crossings.  Because these crossings prevent conventional inspection protocols from being used to assess the pipeline's condition, DuPont contracted with MI to utilize long-range ultrasonic technology as a screening tool to locate and characterize any defects in the pipeline.

11.     MI was aware that one of the purposes of the inspection was for DuPont to identify repair work that needed to be performed on the pipeline during the scheduled Louisville Plant shutdown in April 2004.

12.     MI conducted its inspection from March 31 through April 1, 2004, and was paid $13,429.97 by DuPont for these services.

13.     Following its inspection, MI issued an Inspection Report detailing its findings. (The "Report" which is attached as Ex. B.)  The Report divided the pipeline into fifteen sections for purposes of the inspection and placed each section into one of three categories.  A designation of Category 1 meant that the pipeline had less than 20% wall loss; Category 2 meant there was 20% to 50% wall loss, and Category 3 meant greater than 50% wall loss.  Eleven of the sections were deemed by MI to fall into Category 1 and showed "no significant areas of concern";  four sections were deemed by MI to be Category 2 with "minor indications" of wall loss on the pipeline, and no section was designated by MI as being so deteriorated as to fall into Category 3.

14.     In reliance on MI's Inspection Report, in April 2004 DuPont repaired two of the areas of the pipeline that MI had designated as "Category 2," which showed some evidence of corrosion.

15.     On November 3, 2005, DuPont entered into another contract with MI, Purchase Order No. 4500405916, to perform a follow-up inspection of the pipeline.  (Purchase Order No. 4500405916 is attached as Ex. C.)  That inspection was scheduled to take place November 17-19, 2005.

16.     On November 18, 2005, a chloroform leak was discovered on a section of the pipeline that was previously inspected by MI and/or which MI reported to be within Category 1 and having "no significant areas of concern."  The leak was found beneath a road crossing on the Rohm and Haas site.

17.     Because chloroform is a toxic material, as soon as the leak was observed, DuPont immediately initiated emergency response procedures and shut down the Louisville Plant's operations in an attempt to mitigate the leak.  Despite DuPont's swift response, contamination of the soil and surface water could not be prevented.

18.     As a result of the chloroform leak, DuPont had to expend over $2,029,462.21 to remediate the soil and surface water adjacent to the spill location, as well as repair the pipeline.

19.     The external condition of the pipeline was so deteriorated that the corrosion of the pipe wall had to have been present, in a substantial degree, in March of 2004.  Thus, MI's 2004 Inspection Report misrepresented the integrity of that section of the pipeline.

20.     When confronted with this discrepancy, MI admitted that, contrary to its Inspection Report, it did not inspect the area of the pipe where the leak occurred.

4

21.     Had MI properly inspected the area of the pipeline where the leak occurred, and reported its deteriorated condition to DuPont, DuPont would have immediately repaired the pipe, as was done with the pipe sections designated as Category 2. Thus, the chloroform leak would have been avoided.

22.     MI's failure to adequately inspect the pipeline and/or truthfully report its conduct to DuPont directly caused to the failure of the pipe wall and the resultant leak of chloroform.

## COUNT I: BREACH OF CONTRACT
### (PERFORMANCE)

23.     DuPont repeats and realleges paragraphs 1 through 22 above as if fully set forth herein.

24.     Defendant MI is bound by the terms of the Contract, which required it to inspect all 3,600 feet of the pipeline specifically identified in the Contract, and accurately report its findings.

25.     MI breached its obligation by failing to adequately inspect the area of the pipeline where the leak occurred, and/or by reporting, inaccurately, that the pipe was in good condition at that location.

26.     As a result of MI's breach of the terms of the Contract, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT II: FRAUD
### (Pled in the Alternative)

27.     DuPont repeats and realleges paragraphs 1 through 26 above as if fully set forth herein.

28.     By virtue of the parties' Contract, MI had a duty to truthfully disclose the scope and results of its inspection of the pipeline.

29.    MI's Inspection Report falsely represented the condition of the pipeline where the leak occurred or, at the very least, omitted the fact that MI did not properly inspect the subject area of the pipeline.

30.    MI knew that the misrepresentations contained in the Inspection Report were false, and/or made the misrepresentation with reckless indifference to its truth.

31.    MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline and, by issuing a false Inspection Report, MI intended to induce DuPont to refrain from conducting all necessary repairs.

32.    DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

33.    As a result of its reliance on the false report, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT III:   INTENTIONAL MISREPRESENTATION
### (Pled in the Alternative)

34.    DuPont repeats and realleges paragraphs 1 through 33 above as if fully set forth herein.

35.    MI deliberately concealed the fact that it did not inspect the area of the pipeline where the leak occurred and/or failed to accurately report the condition of the pipeline, despite its obligation to do so.

36.    The condition of the pipeline at all points along the 3,600 foot corridor was material, and, indeed, constituted the sole purpose of the parties' contract.

37.    MI acted with scienter because it knew that its Inspection Report contained false information about the integrity of the pipeline.

6

38.    MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline.  By issuing a false Inspection Report, MI intended to induce DuPont to refrain from conducting all necessary repairs.

39.    DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

40.    As a result of MI's concealment, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT IV:  NEGLIGENT MISREPRESENTATION
### (Pled in the Alternative)

41.    DuPont repeats and realleges paragraphs 1 through 40 above as if fully set forth herein.

42.    By virtue of the parties' Contract, MI had a duty to truthfully disclose the scope and results of its inspection of the pipeline.

43.    MI's Inspection Report falsely represented the condition of the pipeline where the leak occurred or, at the very least, omitted the fact that MI did not properly inspect the subject area of the pipeline.

44.    MI failed to exercise reasonable care in conducting its inspection and in communicating the results of its inspection to DuPont.

45.    MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline.

46.    DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

47.    As a result of its justifiable reliance on the false report, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT V:    BREACH OF CONTRACT
### (SUBCONTRACTING)

48.     DuPont repeats and realleges paragraphs 1 through 47 above as if fully set forth

herein.

49.     On October 1, 2007, MI filed a motion for leave to file a third party complaint

against Mike Walker ("Walker") and NDT Equipment Services LTD ("NDT").  MI claims that it

subcontracted with Mr. Walker and NDT to inspect the pipeline at DuPont's Louisville,

Kentucky facility.

50.     MI's third party complaint implies that Walker and/or NDT inspected the pipeline

at DuPont's Louisville, Kentucky site.

51.     MI's third party complaint further alleges that it was "Walker and/or NDT" who

drafted the 2004 Inspection Report upon which DuPont detrimentally relied.

52.     MI's motion for leave to file a third party complaint, and the proposed third party

complaint attached thereto, is the first notice DuPont ever received that anyone other than

employees of MI conducted the March 2004 inspection or drafted the Inspection Report.

53.     MI's motion for leave to file a third party complaint, and the proposed third party

complaint attached thereto, is the first time DuPont learned of NDT's involvement.

54.     MI consistently represented to DuPont that Walker, who was one of the

individuals who conducted the March 2004 inspection, was an employee of MI.

55.     In its Initial Disclosures pursuant to Civil Rule 26(a)(1), MI identified "Mike

Walker" as an employee of MI.

56.     The 2004 Inspection Report is on MI's letterhead and, although it identifies Mike

Walker as the drafter, it does not mention NDT or the fact that Walker is not employed by MI.

57.    The parties' Contract strictly forbids MI from subcontracting the work it was hired by DuPont to perform without DuPont's prior written consent. *See* Ex. A hereto, Para. 8 of General Site Conditions.

58.    MI did not seek DuPont's consent before, or after, it subcontracted its obligations under the Contract to Walker and NDT.

59.    At no time did DuPont consent to MI's decision to subcontract its obligations under the parties' Contract.

60.    MI's unilateral decision to subcontract the performance of its obligations under the parties' Contract constitutes an independent breach of that Contract.

61.    As a result of MI's breach of the terms of the Contract, DuPont has suffered additional damages to be determined at trial.

### COUNT VI:  FRAUD
### (SUBCONTRACTING)

62.    DuPont repeats and realleges paragraphs 1 through 61 above as if fully set forth herein.

63.    By virtue of the parties' Contract, MI had a duty to disclose, and seek prior written consent for, its decision to subcontract its inspection obligations to Walker and NDT.

64.    MI falsely and affirmatively represented that Walker was an MI employee while knowing that representation to be false.

65.    MI falsely and affirmatively represented that it performed the pipeline inspection, while knowing that representation to be false.

66.    MI falsely and affirmatively represented that it drafted the Inspection Report, while knowing that representation to be false.

67.    MI was aware that DuPont would rely upon its misrepresentation that Walker was a MI employee and/or that it performed the inspection and/or that it drafted the Inspection Report, and, by failing to disclose the truth, MI intended to induce DuPont to refrain from objecting to the subcontracting arrangement.

68.    Had DuPont known that MI would subcontract the inspection and/or drafting of the Inspection Report to NDT and/or Mike Walker, DuPont would not have retained MI.

69.    As a result of its reliance on MI's fraud, DuPont has suffered additional damages to be determined at trial.

## COUNT VII: FRAUD
## (DEPRIVING DUPONT OF A REMEDY)

70.    DuPont repeats and realleges paragraphs 1 through 69 above as if fully set forth herein.

71.    DuPont acted in justifiable reliance on MI's fraud by filing this lawsuit against MI alone.

72.    Had DuPont known of NDT's involvement, it would have named NDT and Mike Walker, individually, as defendants in this lawsuit as well.

73.    MI's fraud has potentially deprived DuPont of recovery against NDT and/or Walker for their part in the inspection and Inspection Report.

74.    As a result of its reliance on MI's fraud, DuPont has suffered additional damages to be determined at trial.

## PRAYER FOR RELIEF

DuPont respectfully requests that this Court enter judgment in favor of DuPont, as follows:

      (a)     against defendant MI for damages in the amount of at least $2,029,462.21;

      (b)     against defendant MI for pre- and post-judgment interest on the sum of all damages awarded to DuPont against the defendant;

      (c)     against defendant MI for punitive damages based on its reckless and/or intentional conduct in performing an inadequate inspection and issuing an inaccurate Inspection Report;

      (d)     against defendant MI for punitive damages based on its fraudulent conduct in surreptitiously subcontracting its obligations under the Contract and continuing to misrepresent that Walker was an employee of MI;

      (e)     against defendant MI for the fees and costs incurred in asserting this action, including attorneys' fees; and

      (f)     such other and further relief the Court may deem just and proper.

POTTER ANDERSON & CORROON LLP

By: _Sarah E. DiLuzio_

Kathleen Furey McDonough (I.D. # 2395)
Sarah E. DiLuzio (I.D. # 4085)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19801
Telephone: (302) 984-6000

*Attorneys for Plaintiff*
*E. I. du Pont de Nemours and Company*

Dated: November 2, 2007
824992v2/20120-435

11

# **EXHIBIT E**



# MECHANICAL INTEGRITY
S P E C I A L I S T S   I N   N D E

| EQUIPMENT | ENGINEERING | SERVICES | TRAINING/CONSULTING | CONTACT US | Mar |

Our state-of-the-art technology produces accurate, reputable inspection data

## Specialist in NDE

"Mechanical Integrity team works as your partner in the community, providing you with our wealth of experience, versatility and professional services. We specialize in problem detection; prevention and finding solutions which best meet your needs and your concerns for the environment. "

## Mechanical Integrity - the Logical Choice

Mechanical Integrity is committed to providing the benefits of the most up-to-date inspection technologies to support our clients, world-wide, in operating their plants efficiently and in an environmentally safe condition.

Our most frequently used services are:

- Detection of Corrosion at Pipe Supports and in semi-buried piping: An application of EMAT dry coupled low frequency ultrasound.

- Wet Hydrogen (HIC) damage can be effectively detected and monitored by applying multi-channel Automated Ultrasonic Techniques (AUT).

- Clad Inspection can be performed to check for disbonds in clad metals & plastics by applying Multi channel Automated Ultrasonic Techniques (AUT).

- Corrosion under insulation can be detected and monitored by using Long Range Inspections

- Eddy Current inspection: A new technique designed to detect environmental cracking at temperatures of 1000 F.

- Ultrasonic weld inspection, using an array of transducers to produce three-dimensional images of flaws in welds by applying Pulse Echo, Time of Flight Diffraction and Line Scan techniques.

- Flange inspection to examine the flange face and ring groove areas without breaking open the flanges.

- Corrosion inspection with ultrasonics at ambient and elevated temperatures, scanning up to 800 square feet per day.

Mechanical Integrity team works as your partner in the community, providing you with our wealth of experience, versatility and professional services. We specialize in problem detection;

### Latest News
An Open Le
We would like to take the opportu
an update regarding developments
Inc. ove

Augu:
News and

Automatic Ultrasoni
The system consists of a computer
based on a laptop computer a
umbil

Ultrasonic Inspection of
The purpose of this automated Ultr
determine the condition of the bon
steel and the stainless ste

EMAT Ultrasonic Corro
The document provides informatio
EMAT Technology used to detect
technique provides qualitative not qu
the severity of the c

http://www.mechanicalintegrityinc.com/                                          3/20/2008

prevention and finding solutions which best meet your needs and your concerns for the environment.

Mechanical Integrity is able to provide the benefits of thirty-five years experience by applying advanced, innovative automated inspection to the power utility, petrochemical and aerospace industries. Our high speed inspection and advanced scanning techniques combined with our onsite reporting provides our client with the best technical answer to their requirements in the shortest possible time frame. We focus on our professionalism, integrity, and dedication.

Phone

© 2006 Mechanical Integrity, Inc. .
Terms of I



**MECHANICAL INTEGRITY**

SPECIALISTS IN NDE

EQUIPMENT          ENGINEERING          SERVICES          TRAINING/CONSULTING          CONTACT US     Mar

Home

# EQUIPMENT

**Our Difference**

Mechanical Integrity is able to provide the benefits of thirty-five years experience by applying advanced, innovative automated inspection to the power utility, petrochemical and aerospace industries. Our high speed inspection and advanced scanning techniques combined with our onsite reporting provides our client with the best technical answer to their requirements in the shortest possible time frame. We focus on our professionalism, integrity, and dedication.

Mechanical Integrity provides state-of-the-art Testing equipment for your company.

- TD Pocket Scan

- TOFD Probe/Scanner

- TD Focus-Scan Multi-function

- MII High Temperature Scan

Contact us to receive more information.

Click to View Our Regional Contact Areas:



Phone
© 2006 Mechanical Integrity, Inc.
Terms of !



# MECHANICAL INTEGRITY
### SPECIALISTS IN NDE

| EQUIPMENT | ENGINEERING | SERVICES | TRAINING/CONSULTING | CONTACT US | Mar |

[Home](#)

## ENGINEERING

**Our Difference**

Mechanical Integrity is able to provide the benefits of thirty-five years experience by applying advanced, innovative automated inspection to the power utility, petrochemical and aerospace industries. Our high speed inspection and advanced scanning techniques combined with our onsite reporting provides our client with the best technical answer to their requirements in the shortest possible time frame. We focus on our professionalism, integrity, and dedication.

Mechanical Integrity provides state-of-the-art engineering services for your company.

- MI Imager

- MII High Temperature Scanner

- HTEC EC

- Engineering Capabilities

  Contact us to receive more information.

Phone

© 2006 Mechanical Integrity, Inc.
Terms of t



| EQUIPMENT | ENGINEERING | SERVICES | TRAINING/CONSULTING | CONTACT US |

Home

## SERVICES:

**Our Difference**

Mechanical Integrity is able to provide the benefits of thirty-five years experience by applying advanced, innovative automated inspection to the power utility, petrochemical and aerospace industries. Our high speed inspection and advanced scanning techniques combined with our onsite reporting provides our client with the best technical answer to their requirements in the shortest possible time frame. We focus on our professionalism, integrity, and dedication.

Alternating Current Field Measurement (ACFM)

Automated Ultrasonic Clad Inspection

Automated Ultrasonic Weld Inspection

Automated Ultrasonic Inspection

Automated MicrowavInspection of Dielectric Components

EMAT Ultrasonic Corrosion Inspection

Firewater Facility Maintenance Doc.pdf

Flange Face Corrosion Detection Using Phased Array Technology

Fitness for Service.pdf

Guided Wave Inspection

High Temperature Ultrasonic Examinations

Positive Material & Weld Identification

PVM datasheet.pdf

SideScan Touchpoint Corrosion Inspection

Sonic Survey Data Sheet

Tech Boiler Tube Cracks

Tech Flange Corrosion

Tech MUD Drum

Tech Ring Groove Inspection

TOFD

Tube Test

X-ray

Phone
© 2006 Mechanical Integrity, Inc.
Terms of l



**MECHANICAL INTEGRITY**

SPECIALISTS IN NDE

EQUIPMENT        ENGINEERING        SERVICES        TRAINING/CONSULTING        CONTACT US    Mar

Home                                        **TRAINING AND CONSULTING:**

**Our Difference**

Mechanical Integrity is able to provide the benefits of thirty-five years experience by applying advanced, innovative automated inspection to the power utility, petrochemical and aerospace industries. Our high speed inspection and advanced scanning techniques combined with our onsite reporting provides our client with the best technical answer to their requirements in the shortest possible time frame. We focus on our professionalism, integrity, and dedication.

Mechanical Integrity provides training and consulting services for your company. We offer:

- UT Level I and II

- TOFT Training

- Phased Array

- http://www.lavender-ndt.com/

  Contact us to view schedules and training times.

Phone

© 2006 Mechanical Integrity, Inc.

Terms of t



**MECHANICAL INTEGRITY**
SPECIALISTS IN NDE

| EQUIPMENT | ENGINEERING | SERVICES | TRAINING/CONSULTING | CONTACT US | Mar |

Home

## Request Information Online

**Contact Us:**

### Our Difference

Mechanical Integrity is able to provide the benefits of thirty-five years experience by applying advanced, innovative automated inspection to the power utility, petrochemical and aerospace industries. Our high speed inspection and advanced scanning techniques combined with our onsite reporting provides our client with the best technical answer to their requirements in the shortest possible time frame. We focus on our professionalism, integrity, and dedication.

Mechanical Integrity is able to provide the benefits of thirty-five years experience by applying advanced, innovative automated inspection to the power utility, petrochemical and aerospace industries. Our high speed inspection and advanced scanning techniques combined with our onsite reporting provides our client with the best technical answer to their requirements in the shortest possible time frame.

We focus on our professionalism, integrity, and dedication.

To discuss how this capability and experience can be of service to you, simply call, write or e-mail:-

**Mail:**
Mechanical Integrity Inc,
PO Box 398, Humble, Texas 77347
Phone 1 281 540 0314
Fax 1 281 540 0317

Physical Address:
1423 East First St
Humble, Texas 77347

* For General inquiries, please cont
E-mail Mechanical Integrity Inc
* For Website Problems/Questions:
Webmaster

---

SEND MORE INFORMATION REGARDING
☐ Request for Bid          ☐ Request for Info

FIRST NAME

LAST NAME

COMPANY NAME

DAY TIME PHONE

EMAIL

TITLE

ADDRESS

CITY, STATE                          State:

ZIP

COUNTRY              ⦿ US. ○ Other :

☐ *TIME IS IMPORTANT! Please call me ASAP!*

**Enter request in box below:**

[ Submit ] [ Reset ]

Phone

© 2006 Mechanical Integrity, Inc.

Terms of

**EXHIBIT F**

1 of 1 DOCUMENT



Positive
As of: Apr 08, 2008

**AMERICAN BIO MEDICA CORPORATION, Plaintiff, v. PENINSULA DRUG ANALYSIS CO., INC.; JAMES T. RAMSEY; PHAMATECH, INC.; DIPRO DIAGNOSTIC PRODUCTS, INC.; DIPRO DIAGNOSTIC PRODUCTS OF NORTH AMERICA, INC., Defendants.**

**Civil Action No. 99-218-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1999 U.S. Dist. LEXIS 12455*

**August 3, 1999, Decided**

**NOTICE:**          [*1]        FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:**     Defendants' motions to dismiss granted in part and denied in part. Defendants' motions to transfer venue granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed motions to dismiss or transfer venue in plaintiff's action against defendants for design patent infringement, violation of the Lanham Act, and other acts of unfair competition.

**OVERVIEW:** Plaintiff sued defendants for design patent infringement, violation of the Lanham Act, and other acts of unfair competition. Defendant California corporation filed an action in another district. Defendants filed motions to dismiss or transfer venue in plaintiff's action. The court could have exercised personal jurisdiction over defendant Delaware corporation. The issue was whether the exercise of personal jurisdiction over the others comported with the law. Such exercise over defendants Virginia corporation and its sole stockholder and employee was compatible with both *Del. Code Ann. tit. 10, § 3104(c)(1)*, and federal due process considerations. They purposefully directed their activities at Delaware residents, out of which plaintiff's claims arose. There was no compelling evidence that suggested that such exercise would have been unreasonable. The court declined to find that defendant California corporation transacted business consistent with *§ 3104(c)(1)* and *(3)*; thus, the court could not have exercised personal jurisdiction over it. Motions to dismiss were granted in part and denied in part. Motions to transfer venue were granted.

**OUTCOME:** The court granted in part and denied in part defendant corporations' motions to dismiss. The court could have exercised personal jurisdiction over defendant Delaware corporation and defendant Virginia corporation, as well as over that defendant's sole stockholder and employee. However, the court could not have exercised personal jurisdiction over defendant California corporation. Therefore, the court granted defendants' motions to transfer venue.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN1] When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a prima facie case with the record viewed in the light most favorable to the plaintiff.

1999 U.S. Dist. LEXIS 12455, *

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN2] According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, rather than that of the regional circuit in which the case arose, is applicable.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] Pursuant to *Fed. R. Civ. P. 12(b)(2)*, a court may dismiss a suit for lack of jurisdiction over the person.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN4] Before a court may exercise personal jurisdiction over a defendant there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
[HN5] *Fed. R. Civ. P. 4(e)(1)* states that service of a summons may be effected pursuant to the law of the state in which the district court is located.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN6] The Delaware long-arm statute, *Del. Code Ann. tit. 10, § 3104(c)*, has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN7] The Delaware Supreme Court has not determined that *Del. Code Ann. tit. 10, § 3104(c)* is coextensive with

federal due process, nor does it substitute federal due process analysis for state long-arm analysis.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN8] See *Del. Code Ann. tit. 10, § 3104(c)*.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN9] The conduct embraced in *Del. Code Ann. tit. 10, § 3104(c)(1)* and *(2)*, the transaction of business or performance of work and contracting to supply services or things in the state, may supply the jurisdictional basis for suit only with respect to claims which have a nexus to the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction. Similarly, where the claim is one for tortious injury under *§ 3104(c)(3)*, a single "act or omission" in the state in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN10] In order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts occurring in Delaware actually constitute transacting business in Delaware, i.e., that defendants purposefully availed themselves of the privileges and benefits of Delaware law.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN11] Mere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN12] The distinction between isolated business activities and those giving rise to personal jurisdiction

has been explained on the basis of whether the conduct is part of a general business plan to solicit business in Delaware and deliver products to customers in Delaware.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
[HN13] Due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
[HN14] The minimum contacts must be "purposeful" contacts; even a single act can support jurisdiction so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation."

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
[HN15] Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
[HN16] The Federal Circuit suggests a three-prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair?

***Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview***
***Civil Procedure > Venue > General Overview***
[HN17] Generally, in reviewing a motion for transfer of venue, the court gives great deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well

if there is a related case that has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties.

**COUNSEL:** For plaintiff: Daniel F. Wolcott, Jr., Esquire, Gregory A. Inskip, Esquire, Joanne Ceballos, Esquire, Potter, Anderson & Corroon LLP, Wilmington, Delaware.

For plaintiff: Charles Michael Tobin, Esquire, Hopkins & Sutter, Washington, D.C.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Matthew B. Lehr, Esquire, Maryellen Noreika, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Edward W. Moore, Esquire, Dallas, Texas.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Doreen L. Costa, Esquire, Neil P. Sirota, Esquire, Steven R. Gustavson, Esquire, Of Counsel, Baker & Botts, L.L.P., New York, New York.

For Phamatech, Inc., defendant: Kevin W. Goldstein, [*2] Esquire, Ratner & Prestia, Wilmington, Delaware.

For Phamatech, Inc., defendant: Steele N. Gillaspey, Esquire, Of Counsel, Gillaspey, Harms & Associates, San Diego, California.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

 Dated: August 3, 1999

 Wilmington, Delaware

 **ROBINSON**, District Judge

**I. INTRODUCTION**

 Pending before the court are motions to dismiss or transfer venue filed by defendants Dipro Diagnostic Products of North America, Inc. ("Dipro"), Phamatech,

Inc. ("Phamatech"), and Peninsula Drug Analysis Co., Inc. and James T. Ramsey ("Peninsula" and "Ramsey," respectively). (D.I. 17, 25 and 49) Plaintiff American Bio Medica Corporation ("ABMC") opposes said motions. ABMC owns the rights to U.S. Design Patent No. D404812, which patent issued on January 26, 1999. ABMC is a New York corporation engaged in the manufacture, worldwide distribution and sale of the Rapid Drug Screen, a product covered by the patent at issue. According to ABMC, when the Rapid Drug Screen was developed in 1995, it was the first vertical, hands free test for the detection of the presence of drug residue in urine. Until February [*3] 1999, ABMC purchased test strips from defendant Phamatech for incorporation into the Rapid Drug Screen. ABMC alleges that Phamatech initiated production of its own vertical test kit (Quick Screen) in 1998 or earlier, using proprietary information it acquired by reason of its supply relationship with ABMC.

Defendant Phamatech is a California corporation. According to ABMC, Phamatech distributes Quick Screen through the auspices of defendants Peninsula and Ramsey, among others. Defendant Dipro is a Delaware corporation that, according to ABMC, acquires directly or indirectly from Phamatech an accused product called Rapid Response and distributes that product through Peninsula and Ramsey, among others. Peninsula is a Virginia corporation and Ramsey is the sole stockholder and an employee of Peninsula.

Plaintiff ABMC initiated this lawsuit on April 7, 1999 against defendants for design patent infringement, violation of the Lanham Act, and other acts of unfair competition. A day later, on April 8, 1999, Phamatech filed suit in the United States District Court for the Southern District of California seeking a declaratory judgment that ABMC's design patent is invalid, and joining other [*4] federal and state claims essentially mirroring the claims and operative facts at issue. By decision issued June 21, 1999, Judge Keep of the Southern District of California found that the California court could exercise specific personal jurisdiction over ABMC; however, applying the "first-filed" rule, she stayed the California case pending disposition of the instant motions.

## II. FACTS

The facts are essentially undisputed. Prior to the filing of the complaint, none of the accused products had been sold to a Delaware resident. In the fall of 1998, defendant Peninsula did ship an order of ABMC's Rapid Drug Screen to a Delaware resident, Pace Electric of New Castle, Delaware. Sometime thereafter and prior to January 1999, Peninsula stopped handling ABMC's product. In January 1999, defendant Ramsey and a third

party met with a representative of Pace to discuss a possible business relationship for the sale and distribution of the Phamatech/Dipro product, Rapid Response, in Delaware. These discussions took place in Hawaii and Maryland. Although there are averments of record indicating that some agreement was reached (D.I. 32), it is the court's understanding that no actual sales [*5] or movement of defendants' products occurred in Delaware prior to the filing of the complaint.

Prior to April 1999, Peninsula sent direct mail postcards to Delaware as part of a mass mailing to potential customers in more than 20 states. [1] Both Ramsey and Phamatech maintain national Internet websites that can be accessed from Delaware. It is the court's understanding that these websites include promotional material about the allegedly infringing products, including information on ordering and shipping; however, orders cannot be consummated directly through the websites.

1    Approximately 60 out of a total of 6,000 postcards were directed to Delaware residents. No responses are recorded.

## III. DISCUSSION

### A. Personal Jurisdiction

ABMC, as plaintiff, bears the burden of establishing that this court may exercise personal jurisdiction over defendants. [HN1] When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a *prima facie* case with the record [*6] viewed in the light most favorable to the plaintiff. *See Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1462 (D. Del. 1991); Computer People, Inc. v. Best Int'l Group, Inc., 1999 Del. Ch. LEXIS 96,* No. Civ. A. 16648, 1999 WL 288119, at *4 & n.5 (Del. Ch. Apr 27, 1999). There is no question but that this court can exercise personal jurisdiction over defendant Dipro, a Delaware corporation. The focus of the following discussion, therefore, is whether the exercise of personal jurisdiction over the remaining defendants comports with the law of the Federal Circuit. [2]

2    [HN2] According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995).*

[HN3] Pursuant to *Rule 12(b)(2) of the Federal Rules of Civil Procedure*, a court may dismiss [*7] a suit

for "lack of jurisdiction over the person." According to the United States Supreme Court,

> [HN4] before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987).* The principle pronounced above is traditionally described in this court as a two-step analysis. The court will determine, first, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendants' rights to due process.

[HN5] *Rule 4(e)(1) of the Federal Rules of Civil Procedure* states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." [HN6] The Delaware long-arm statute, *10 Del. C. § 3104(c)*, has been construed "broadly . . . to confer jurisdiction to the maximum extent possible [*8] under the due process clause." *LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986).* As noted by this court in *Intel Corp. v. Silicon Storage Tech., Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998),* [HN7] "the Delaware Supreme Court has not determined that *§ 3104(c)* is coextensive with federal due process, nor does it substitute federal due process analysis for state long-arm analysis." *Accord Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd., 611 A.2d 476, 480-81 (Del. 1992); Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods. Inc., 1991 Del. Ch. LEXIS 113,* Civ. A. No. 12036, 1991 WL 129174, at *3 (Del. Ch. July 10, 1991); *Ramada Inns v. Drinkhall, 1984 Del. Super. LEXIS 599,* No. Civ. A. 83 C-AU-56, 1984 WL 247023, at *2 (Del. Super. May 17, 1984). Therefore, the court must determine that the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendants' constitutional rights to due process. [3]

> 3    The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we . . . defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v.*

*Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed. Cir. 1998).* Thus, in *Luker,* the Federal Circuit's analysis followed that of the Sixth Circuit's holding in *R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc., 811 F.2d 967 (6th Cir. 1987):* "'This Ohio [long-arm] statute has been construed to extend to the outer limits of due process, and thus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations.'" *Luker, 45 F.3d at 1544* (quoting *Dribeck, 811 F.2d at 969).* By contrast, as noted above, the Delaware state courts do not collapse the long-arm inquiry into the due process inquiry and neither shall this court.

[*9] Delaware's long-arm statute provides:

> (c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;
>
> (3) Causes tortious injury in the State by an act or omission in this State;
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State
>
> . . . .

[HN8] *Del. Code Ann. tit. 10, § 3104(c)(1) - (4).*

As explained by the Delaware Supreme Court in LaNuova,

> [HN9] the conduct embraced in subsections (1) and (2), the transaction of business or performance of work and contracting to supply services or things in the State, may supply the jurisdictional basis for suit only with respect to claims

1999 U.S. Dist. LEXIS 12455, *

which have a nexus to [*10] the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction.

. . .

Similarly, where the claim is one for tortious injury under subsection (c)(3),

a single "act or omission" in the State in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

LaNuova, 513 A.2d at 768. Therefore, [HN10] in order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts occurring in Delaware actually constitute "transacting business" in Delaware, i.e., that defendants "purposefully avail[ed themselves] of the privileges and benefits of Delaware law." *Computer People, Inc.*, 1999 WL 288119, at *8; *see also Thorn EMI N. Am. v. Micron Tech., Inc., 821 F. Supp. 272, 274 (D. Del. 1993)* (stating that the designated conduct "must be directed at residents of the State of [*11] Delaware and the protection of its laws"). With this requirement in mind, courts have concluded that [HN11] "mere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware." *Id.* (citing *Moore v. Little Giant Indus., Inc., 513 F. Supp. 1043, 1047 (D. Del. 1981); Waters v. Deutz Corp., 460 A.2d 1332, 1335 (Del. Super. 1983).* [HN12] The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is "part of a general business plan . . . to solicit business in Delaware and deliver products to customers in Delaware." *Thorn EMI, 821 F. Supp. at 274.*

Plaintiff alleges in its complaint seven causes of action, including unlawful use of the trademarks and service marks of the Rapid Drug Screen in violation of the Lanham Act and common and state law trademark rights; violation of the design patent "by making, using and/or selling the ABMC design . . ."; and engaging in unfair competition and deceptive trade practices. (D.I. 1) Although the products at issue have not been made, used, or sold in Delaware, plaintiff [*12] asserts that, "through offers and extensive planning to sell the infringing product in Delaware, defendants have engaged in a course of conduct that readily meets the nexus requirements of *sections 3104(c)(1), (2),* and *(3)*." (D.I. 57 at 7-8)

The record demonstrates that defendants Peninsula and Ramsey have offered to sell [4] allegedly infringing products to Delaware residents through what appears to be a concerted marketing effort. The marketing effort includes national advertisements accessible to Delaware residents (the internet website), out-of-state sales negotiations with a Delaware resident, [5] and the mailing of promotional materials to Delaware residents. Given the history of these defendants' relationship with plaintiff, the record adequately demonstrates that these activities are directed at Delaware residents, constitute "transacting business," and are sufficiently related to plaintiff's causes of action to satisfy the requirements of *10 Del. C. § 3104(c)(1)*. [6] *Cf. Computer People, Inc.*, 1999 WL 288119, at *8. [7]

[4] Plaintiff did not specifically allege such in its complaint; however, *35 U.S.C. § 271(a)* reads "whoever without authority makes, uses, **offers to sell**, or sells any patented invention . . . infringes the patent." (Emphasis added)

[*13]

[5] The out-of-state sales negotiations with Pace Electric are viewed in tandem with defendants' other conduct as evidence of a general business plan directed at Delaware residents and the protection of its laws.

[6] As noted, the court is satisfied that the activities described above are "part of a general business plan" and not isolated, unrelated events. In the past, this court has demanded as well proof that the activities have had a "tangible effect" in Delaware. *See, e.g., Intel Corp., 20 F. Supp. 2d at 696* (". . . SST's solicitations in Delaware [have not] been shown to have had any tangible effect on Intel's sales here."). Sales are lost generally because of the sale of competing products. Given the fact that liability under *35 U.S.C. § 271(a)* can now rest on mere "**offers to sell**," the court is reluctant to require proof of actual sales and is not sure what other "tangible effect" is contemplated. Therefore, the court will not require evidence of "tangible effects" in this case.

[7] Although the court noted that, "as a general matter telephone calls and an e-mail [to a Delaware resident] do not, in and of themselves, automatically constitute 'transacting business' within Delaware sufficient to invoke jurisdiction under *§ 3104(c)(1)*," the court looked at the specific factual context and held that these contacts were insufficient because they could not be a basis for the plaintiff's causes of action.

[*14] The court further finds that the exercise of personal jurisdiction over these defendants comports with federal due process considerations. The Supreme Court in *International Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945)*, held that

> [HN13] due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id. at 316* (citation omitted). The Court in *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*, added the further requirement that [HN14] the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." *Id. at 475 n.18*. Therefore, [HN15] "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case [*15] that the presence of some other considerations would render jurisdiction unreasonable." *Id. at 477*. In *Luker*, [HN16] the Federal Circuit suggested a three-prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair? *See Luker, 45 F.3d at 1545-46*. The court has already answered the first two inquiries in the affirmative and has not discovered in the record any compelling evidence which suggests that the exercise of personal jurisdiction over these defendants would be unreasonable.

The court concludes otherwise with respect to defendant Phamatech. The conduct attributed to Phamatech includes the following: 1) Phamatech manufactures allegedly infringing products; 2) Phamatech arranges for the distribution of its product through defendants Peninsula and Ramsey; and 3) Phamatech advertises its product through an Internet website accessible to Delaware residents. As noted previously, however, there had been no actual sales of infringing product in Delaware prior to the filing [*16] of the complaint. Neither is there evidence relating Phamatech to Peninsula and Ramsey's marketing efforts directed at Delaware residents. Although plaintiff asserts that "Phamatech intentionally established a chain of distribution that it knew, or reasonably could have foreseen, had a termination point in Delaware" (D.I. 62 at 11), the record does not demonstrate the existence of ongoing commercial relationships with retailers and customers **in Delaware**.

The facts of record are distinguishable, therefore, from the facts in *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed. Cir. 1994)*, cited by plaintiff. In that case, the court concluded that the alleged infringers were placing accused products into the chain of commerce, which included shipping products into the forum for sale to customers through an intermediary. Because the commercial relationship with the intermediary was ongoing and the accused products in fact had been shipped into the forum, the court found the defendant amenable to the exercise of personal jurisdiction: "From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the [*17] intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum]." *Royal Sovereign, 21 F.3d at 1564*. Instantly, there is no evidence demonstrating that Phamatech directed Peninsula and Ramsey's sales efforts at Delaware residents; there certainly is no evidence of any ongoing commercial relationships between Phamatech, Peninsula/Ramsey, and Delaware residents. The final conduct designated is Phamatech's Internet website. Assuming for purposes of this motion that a website with product information constitutes an "offer to sell," in the absence of evidence that Delaware residents actually accessed this website, the court declines to find that Phamatech transacted business in Delaware, consistent with *10 Del. C. § 3104(c)(1)* and *(3)*. [8]

> 8    Plaintiff does not assert general jurisdiction under *§ 3104(c)(4)*.

## B. Venue

[HN17] Generally, in reviewing a motion for transfer of venue, this court gives great [*18] deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties. Given the court's conclusion that it cannot exercise personal jurisdiction over defendant Phamatech, the manufacturer of the accused products, transfer of this case to the Southern District of California is warranted.

## IV. CONCLUSION

1999 U.S. Dist. LEXIS 12455, *

For the reasons stated, defendants' motions to dismiss are granted in part and denied in part.

Defendants' motions to transfer venue are granted.

An appropriate order shall issue.

134QX7

```
********** Print Completed **********

Time of Request: Tuesday, April 08, 2008  10:06:31 EST

Print Number:    1862:85873431
Number of Lines: 363
Number of Pages:
```

```
Send To:  BUTLER, STEVEN
          LINARDUCCI & BUTLER
          910 W BASIN RD STE 100
          NEW CASTLE, DE 19720-1015
```

**EXHIBIT G**

4 of 12 DOCUMENTS



Analysis
As of: Apr 08, 2008

**NICE SYSTEMS, INC., and NICE SYSTEMS, LTD., Plaintiffs v. WITNESS SYSTEMS, INC., Defendant**

**Civil Action No. 06-311-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 74642*

**October 12, 2006, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at *Nice Sys. v. Witness Sys., 2007 U.S. Dist. LEXIS 91979 (D. Del., Dec. 14, 2007)*

**COUNSEL:** [*1] For NICE Systems Inc., A Delaware Corporation, NICE Systems Ltd., An Israeli Corporation, Plaintiffs: Josy W. Ingersoll, Melanie K. Sharp, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Witness Systems Inc., A Delaware Corporation, Defendant: Kyle Wagner Compton, William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE.; John D. Hamann, Pro Hac Vice.; Nagendra Setty, Pro Hac Vice.

**JUDGES:** Joseph J. Farnan, Jr., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION**

*MEMORANDUM ORDER*

Pending before the Court is Defendant's Motion For Transfer To The Northern District Of Georgia (D.I. 13). For the reasons discussed, the Motion will be denied.

**I. BACKGROUND**

On May 10, 2006, Plaintiffs (collectively, "NICE") filed this patent infringement case alleging that Defendant's products related to technology used in call centers infringe ten U.S. patents held by Plaintiffs. Plaintiffs are incorporated in Delaware. The parent company, NICE Systems, Ltd., is headquartered in Israel. Plaintiffs' principal place of business in the United States is in New Jersey. Defendant is incorporated in Delaware with its principal place of business in Atlanta, Georgia. [*2] The parties are currently litigating three patent infringement cases in the Northern District of Georgia. On June 19, 2006, Defendant Witness Systems, Inc. ("Witness") filed this Motion For Transfer To The Northern District Of Georgia (D.I. 13).

**II. PARTIES' CONTENTIONS**

By its Motion, Defendant contends transfer to the Northern District of Georgia is appropriate pursuant to *28 U.S.C. § 1404(a)* and warranted by the private and public interest factors identified in *Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995)*. Specifically, Defendant contends that a transfer would best serve the interests of justice and promote judicial economy because litigation is pending in three cases in the Northern District of Georgia that implicate the same or similar technologies and products. Defendant further contends the convenience of the parties and witnesses will be best served by transfer.

In response, Plaintiffs contend that its choice to bring suit in Delaware is entitled to substantial deference because it chose to litigate in Delaware for a rational and legitimate reason, namely, its incorporation in the state. Plaintiffs further contend [*3] that Defendant has not met its burden to show that the factors in *Jumara* "strongly favor" transfer pursuant to *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)*.

**III. LEGAL STANDARD**

2006 U.S. Dist. LEXIS 74642, *

Pursuant to *28 U.S.C. § 1404(a)*, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The Third Circuit has set forth a list of factors for district courts to consider when deciding whether or not to transfer. *Jumara, 55 F.3d at 879-80*. These factors include six private interests: (1) the plaintiff's forum preference as evidenced by his or her original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial condition, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (6) the location of books and records, to the extent that the books and records could not be produced [*4] in a certain forum. *Id. at 879*. The factors also include six public interests for courts to consider: (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. *Id. at 879-80*. Ordinarily, the burden is on the movant to establish that the balance of the interests weighs strongly in favor of the requested transfer. *Shutte, 431 F.2d at 25*. A transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. *Continental Cas. Co. v. Am. Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999)*.

## IV. DISCUSSION

### A. *Whether Plaintiffs' Choice Of Forum Is Entitled To "Paramount Consideration."*

The Plaintiffs' choice of forum is entitled to "paramount consideration." *Shutte, 431 F.2d at 25*. This choice should not be lightly disturbed where there [*5] is a legitimate, rational reason to litigate away from the corporation's "home turf." *Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F. Supp. 759, 764 (D. Del. 1991)*. A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state. *Stratos Lightwave, Inc. v. E2O Communs., Inc., 2002 U.S. Dist. LEXIS 5653 at *7 (D. Del. 2002)*. The Court concludes that Plaintiffs' decision to litigate in Delaware is entitled to deference because although its principal place of business is in New Jersey, it is incorporated in Delaware. Thus, to prevail on its Motion, Defendant must prove that the public and private interest factors strongly favor transfer.

### B. *Whether The Private Interest Factors Strongly Favor Transfer.*

The Court concludes that Defendant has not met its burden of demonstrating the private interest factors weigh strongly in favor of transfer. Defendant contends that the convenience of the parties and witnesses warrants a transfer. (D.I. 15 at 20). Defendant concedes the other private interest factors are "either inapplicable or neutral to the question of transfer." (D. [*6] I. 15 at 20, n. 15). With respect to the convenience of the parties, Defendant contends that the Northern District of Georgia is "more convenient for Witness and at least as convenient for NICE." (D.I. 15 at 21). However, a transfer is not warranted "simply because the transferee court is more convenient for defendants." *Ballard Medical Products v. Concord Laboratories, Inc., 700 F. Supp. 796, 801 (D. Del. 1988)* (citing *Derry Finance v. Christiana Companies, Inc., 555 F. Supp. 1043, 1046 (D. Del. 1983)*. Further, both parties are incorporated in Delaware, and therefore, chose to be corporate citizens of Delaware for legal and other purposes. Certainly, the parties, specifically Defendant, cannot now complain because they are involved in litigation in Delaware. In these circumstances, the Court concludes that Defendant has not demonstrated that the convenience of the parties would be so greatly burdened by litigating in Delaware as to weigh strongly in favor of transfer.

With respect to the convenience of the witnesses, the Court concludes that this factor does not weigh strongly in favor of transfer. Defendant contends that its employees and former employees [*7] reside near Atlanta, Georgia, as well as several "key" witnesses. The convenience of the witnesses is only relevant to the extent they would be unavailable for trial in the forum. *Jumara, 55 F.3d at 879*. Employee witnesses, however, are not part of the analysis of this factor because they are presumed willing to testify at trial.

With respect to Defendant's former employee witnesses, the Court concludes their convenience weighs slightly in favor of transfer. Defendant contends that the former employees in Georgia are key witnesses that cannot be compelled to be present at trial in Delaware. The Court concludes that because these potential witnesses may be beyond the Court's subpoena power, this factor weighs in favor of transfer. However, Defendant has not demonstrated that the witnesses would be unwilling to testify voluntarily or that their information is not available in another form. Accordingly, the Court concludes that this factor does not weigh strongly in favor of transfer.

### C. *Whether The Public Interests Strongly Favor Transfer*

2006 U.S. Dist. LEXIS 74642, *

The Court concludes that the public interests do not weigh strongly in favor of a transfer. With respect to Defendant's [*8] contention that practical considerations of judicial economy weigh strongly in favor of transfer, the Court concludes this factor weighs only slightly in favor of transfer. Although the instant action involves some overlap of parties, products, and technologies with the three cases pending in the Northern District of Georgia, the Court concludes that the actions are not sufficiently related to warrant transfer. The three actions pending in Georgia are at various stages of litigation before three different judges and two of the pending cases have survived a motion to consolidate. The Court concludes that adding another case to the Northern District of Georgia docket will not serve the interests of judicial economy more than litigating the instant case in this Court. Thus, the Court concludes this factor does not weigh strongly in favor of transfer.

Additionally, the Court finds there is no strong local interest in litigating this action in Georgia. The instant action is a patent infringement case and patent rights generally do not give rise to a local controversy or implicate local interests. Thus, the Court concludes this factor does not weigh strongly in favor of transfer. For the [*9] reasons discussed, the Court will deny Defendant's Motion For Transfer.

### ORDER

NOW THEREFORE IT IS HEREBY ORDERED this 12 day of October, 2006, that Defendant Witness Systems, Inc.'s Motion For Transfer To The Northern District of Georgia (D.I. 13) is **DENIED.**

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE

134QX7

```
********** Print Completed **********

Time of Request: Tuesday, April 08, 2008   09:49:02 EST

Print Number:    1821:85869577
Number of Lines: 132
Number of Pages:
```

```
Send To:  BUTLER, STEVEN
          LINARDUCCI & BUTLER
          910 W BASIN RD STE 100
          NEW CASTLE, DE 19720-1015
```

# EXHIBIT A

# EXHIBIT H

3 of 4 DOCUMENTS



Analysis
As of: Apr 08, 2008

## M. FREDERICK PIERCE, et al. v. HAYWARD INDUSTRIES, INC., et al.

### CIVIL ACTION NO. 05-5322

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2006 U.S. Dist. LEXIS 81393*

**November 6, 2006, Decided**
**November 7, 2006, Filed; November 8, 2006, Entered**

**PRIOR HISTORY:** *Pierce v. Hayward Indus., 2006 U.S. Dist. LEXIS 16472 (E.D. Pa., Apr. 4, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed suit against defendant manufacturers after he was seriously injured at his residence in Malvern, Pennsylvania when his pool filter violently exploded in his face while he was performing required annual maintenance work. One defendant filed a motion to dismiss under *Fed. R. Civ. P. 12(b)(2)* for lack of personal jurisdiction.

**OVERVIEW:** Defendant was incorporated under the laws of the State of California, and its principal place of business was located in Ontario, California. Defendant did not own, use or possess any real property within Pennsylvania; it did not pay business or other taxes to Pennsylvania; it did not maintain any offices, or have any agents or employees, located within the Commonwealth. The court first found that plaintiff had not established sufficient minimum contacts with Pennsylvania to show that defendant could have reasonably anticipated being sued here or that any of the three Asahi tests for the exercise of specific jurisdiction had been met. The court reasoned in part that the sleeve nut in question was not sold in Pennsylvania, and no other defendant sleeve nuts were sold to Pennsylvania businesses. Next, the court found that defendant's website did not demonstrate its continuous and systematic business operations in Pennsylvania. The court reasoned that there was no allegation that the brass

used in the allegedly defective sleeve nut was purchased over the internet or that the sleeve nut was sold via the internet so that the exercise of specific jurisdiction would be appropriate.

**OUTCOME:** Defendant's motion was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN1] Once a defendant asserts a lack of personal jurisdiction, the burden to prove otherwise is on the plaintiff. To satisfy this burden, a plaintiff must establish with reasonable particularity sufficient contacts between the defendant and the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*
[HN2] A federal court exercises personal jurisdiction to the extent authorized by the state's long-arm statute. *Fed.*

*R. Civ. P. 4(e)*. Pennsylvania's statute extends jurisdiction to the fullest extent allowable under the Constitution, *42 Pa. Cons. Stat. § 5322(b)*. Constitutional jurisdiction can be established two different ways: specific jurisdiction and general jurisdiction. Specific jurisdiction is established when the basis of the plaintiff's claim is related to or arises out of the defendant's contacts with the forum. General jurisdiction does not require the defendant's contacts with the forum state to be related to the underlying cause of action, but the contacts must have been "continuous and systematic."

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts***
[HN3] The Pennsylvania Long Arm statute, *42 Pa. Cons. Stat. § 5322*, provides that specific jurisdiction can be exercised over a defendant who transacts any business in Pennsylvania or caused harm or tortious injury in Pennsylvania by an act or omission outside of Pennsylvania. In deciding whether specific personal jurisdiction is appropriate, a court must first determine whether the defendant had the minimum contacts with the forum necessary to have reasonably anticipated being haled into court there. Second, assuming minimum contacts have been established, a court may inquire whether the assertion of personal jurisdiction would comport with traditional conceptions of fair play and substantial justice. The first step is mandatory but the second step is discretionary.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Placement of Product in Commerce***
[HN4] In addition to direct sales of products into a forum state, a defendant may create the minimum contacts necessary for a court to assert specific jurisdiction by placing a product into the "stream of commerce," which through a chain of distribution finds its way into the forum state. In its plurality opinion, the United States Supreme Court proposed three separate tests for establishing stream of commerce jurisdiction. One test is whether any conduct by a defendant shows an intent to serve the market in the forum state. A second test requires demonstration of an awareness that the final

product is marketed in the forum state in the regular and anticipated flow of products. A third test would evaluate the volume, value and hazardous nature of the goods entering the forum state.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Placement of Product in Commerce***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment***
[HN5] In the context of personal jurisdiction, the United States Court of Appeals for the Third Circuit has not yet adopted any of the three stream of commerce tests. However, it has made clear that a defendant must have engaged in some form of "purposeful availment" of the laws of the forum state.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts***
[HN6] Pursuant to *42 Pa. Cons. Stat. § 5301(2)*, general jurisdiction can be exercised over a corporation in Pennsylvania if the corporation: (a) is incorporated in Pennsylvania; or (b) has consented to jurisdiction; or (c) carries on a continuous or systematic part of its general business in Pennsylvania. Whether plaintiff can establish general jurisdiction depends on whether defendant has carried out continuous and systematic business within Pennsylvania. Numerous factors are used to assess the level of contacts, including the maintenance of offices, location of assets or employees within the forum state, as well as direct advertising and sales in the forum state. The amount of business conducted in the state is less important than the nature of defendant's business in the state, that is, whether the business dealings are central to the defendant's business and how frequently such dealings occur.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts***
[HN7] Mere purchases, even if occurring at regular intervals, are not enough to warrant a state's assertion of in personam jurisdiction over a nonresident corporation

2006 U.S. Dist. LEXIS 81393, *

in a cause of action not related to those purchase transactions.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*

[HN8] To the extent that a direct solicitation or contractual agreement sent via email directly leads to a civil action, jurisdiction is readily exercised. Actions involving domain names that infringe on trademarks, or companies that offer purely (or primarily) internet-based services are also straightforward; jurisdiction and interstate activities are central to the case, so the exercise of specific jurisdiction is warranted. In personal injury cases, plaintiffs have attempted to assert general personal jurisdiction over non-resident defendants based solely on the existence of a defendant's website having nothing to do with the alleged injury. Because a website is always available, it is likened to "continuous and systematic" activity in the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*

[HN9] The mere operation of a commercially interactive web site should not subject the operation to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant purposefully availed itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*

[HN10] Courts have shown a reluctance to exercise personal jurisdiction based solely on a website and have looked at interactivity along with other factors.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*

[HN11] In the context of personal jurisdiction, much like an in-print advertising campaign, a website must either be "central" to the defendant's business in the forum state or specifically target residents of the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*

[HN12] There is an understandable judicial reluctance to extend the traditional limits on the exercise of personal jurisdiction over defendants based solely on a website accessible from the forum state. Whether the site is deemed not interactive enough, not targeted toward the forum state, not central to the defendant's business, or simply having no "connexity" to the cause of action, courts have resisted asserting general jurisdiction in these circumstances.

COUNSEL: For UPM INC., Defendant: PETER BLUDMAN, LEAD ATTORNEY, MARGOLIS, EDELSTEIN INDEPENDENCE SQ. WEST, PHILADELPHIA, PA.

For R.G. RAY CORP., Defendant: THOMAS P. BRACAGLIA, LEAD ATTORNEY, MARSHALL DENNEHEY WARNER COLEMAN GOGGIN, PHILADELPHIA, PA.

For R.G. RAY CORP., Cross Defendant: THOMAS P. BRACAGLIA, LEAD ATTORNEY, MARSHALL DENNEHEY WARNER COLEMAN GOGGIN, PHILADELPHIA, PA.

For LEE SPRING CO., INC., Cross Defendant: ALLEN R. BUNKER, LEAD ATTORNEY, COMEAU & BUNKER FOUR PENN CENTER, PHILADELPHIA, PA.

For LEE SPRING CO., INC., Defendant: ALLEN R. BUNKER, LEAD ATTORNEY, COMEAU & BUNKER FOUR PENN CENTER, PHILADELPHIA, PA.

For GREGORY PIERCE, JOHN PIERCE, LORRAINE M. PIERCE, M. FREDERICK PIERCE, Plaintiffs: JOSEPH P. CONNOR, III, LEAD ATTORNEY, CONNOR WEBER & OBERLIES, PC, PAOLI, PA.

For BINDER METAL PRODUCTS, INC., Cross Defendant: FRANCIS J. DEASEY, LEAD ATTORNEY, DEASEY, MAHONEY & BENDER, LTD., PHILADELPHIA, PA.

For BINDER METAL PRODUCTS, INC., Defendant: FRANCIS J. DEASEY, LEAD ATTORNEY, DEASEY, MAHONEY & BENDER, LTD., PHILADELPHIA, PA.

For IMPERIAL SPRING CO., INC., Cross Defendant: JORDAN S. DERRINGER, RAWLE & HENDERSON, PHILADELPHIA, PA, US.

For IMPERIAL SPRING CO., INC., Defendant: JORDAN S. DERRINGER, RAWLE & HENDERSON, PHILADELPHIA, PA, US.

For HAYWARD INDUSTRIES, INC., HAYWARD POOL PRODUCTS, INC., LESLIE'S POOLMART, INC., Defendants: JONATHAN DRYER, LEAD ATTORNEY, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, PHILADELPHIA, PA.

For HAYWARD INDUSTRIES, INC., LIBERTY BRASS TURNING CO., INC., Cross Defendants: JONATHAN DRYER, LEAD ATTORNEY, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, PHILADELPHIA, PA.

For HAYWARD POOL PRODUCTS, INC., Defendant: FRANCIS P. MANCHISI, LEAD ATTORNEY, WHITE PLAINS, NY, US.

For LIBERTY BRASS TURNING CO., INC., Cross Claimant: W. KELLY MCWILLIAMS, LEAD ATTORNEY, GIBLEY AND MCWILLIAMS, P.C., MEDIA, PA.

For LIBERTY BRASS TURNING CO., INC., Defendant: W. KELLY MCWILLIAMS, LEAD ATTORNEY, GIBLEY AND MCWILLIAMS, P.C., MEDIA, PA.

For GREGORY PIERCE, JOHN PIERCE, LORRAINE M. PIERCE, M. FREDERICK PIERCE, Plaintiffs: MARY ELLEN F. PINA, LEAD ATTORNEY, CONNOR WEBER & OBERLIES, PAOLI, PA, US.

For ALGER MANUFACTURING COMPANY, INC., Defendant: MICHAEL J. PLEVYAK, LEAD ATTORNEY, WHITE & WILLIAMS LLP, BERWYN, PA.

For SHALLCROSS BOLT & SPECIALTIES CO., Cross Claimant: GEORGE A. PRUTTING, JR., LEAD ATTORNEY, PRUTTING & LOMBARDI, AUDUBON, NJ.

For SHALLCROSS BOLT & SPECIALTIES CO., Cross Defendant: GEORGE A. PRUTTING, JR., LEAD ATTORNEY, PRUTTING & LOMBARDI, AUDUBON, NJ.

For R.G. RAY CORP., Defendant: JUDITH H. RING, LEAD ATTORNEY, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, PHILADELPHIA, PA.

For H.C. JOHNSON INDUSTRIES, LTD., Defendant: THOMAS E. SCANLON, SWARTZ CAMPBELL LLC, PHILADELPHIA, PA.

For H.C. JOHNSON INDUSTRIES, LTD., Cross Defendant: THOMAS E. SCANLON, SWARTZ CAMPBELL LLC, PHILADELPHIA, PA.

For ACCUTITE FASTENERS, Defendant: LOIS M. SHENK, LEAD ATTORNEY, POST & SCHELL, PC, PHILA, PA.

For GREGORY PIERCE, JOHN PIERCE, LORRAINE M. PIERCE, M. FREDERICK PIERCE, Plaintiffs: WILLIAM J. WEBER, JR., LEAD ATTORNEY, CONNOR WEBER & OBERLIES PC, PAOLI, PA.

For REV-CO SPRING MANUFACTURING, INC., Cross Claimant: DAVID S. WOLF, LEAD ATTORNEY, JENKINS WOLF RUBINATE & HASSON, PHILADELPHIA, PA.

For REV-CO SPRING MANUFACTURING, INC., Cross Defendant: DAVID S. WOLF, LEAD ATTORNEY, JENKINS WOLF RUBINATE & HASSON, PHILADELPHIA, PA.

For REV-CO SPRING MANUFACTURING, INC., Defendant: DAVID S. WOLF, LEAD ATTORNEY, JENKINS WOLF RUBINATE & HASSON, PHILADELPHIA, PA.

**JUDGES:** [*1] Norma L. Shapiro, S.J.

**OPINION BY:** Norma L. Shapiro

**OPINION**

**MEMORANDUM AND ORDER**

    **Norma L. Shapiro, S.J.**

    November 6, 2006

    Defendant Alger Manufacturing Comany ("Alger") has moved to dismiss plaintiffs' complaint under *Fed.R.Civ.P. 12(b)(2)* for lack of personal jurisdiction. Alger's previous motion to dismiss on the same grounds was denied without prejudice, so that plaintiffs could take limited discovery on the question of jurisdiction. Alger renewed its motion to dismiss after the completion of that discovery. Alger's motion will be granted because

plaintiffs have not established sufficient contacts with the Commonwealth of Pennsylvania or demonstrated that Alger carries on continuous and systematic business within the state.

## I. Facts

On May 22, 2004, plaintiff M. Frederick Pierce was seriously injured at his residence in Malvern, Pennsylvania when his pool filter violently exploded in his face while he was performing required annual maintenance work. The pool filter was manufactured by Alger's co-defendant Hayward Industries, Inc. Alger is a manufacturer of precision machined products, including a brass sleeve nut that was incorporated [*2] in the Hayward pool filter.

Alger is not a Pennsylvania corporation. It is incorporated under the laws of the State of California, and its principal place of business is located in Ontario, California. (Affidavit of Duane Femrite, Chairman of the Board and Chief Executive Officer of Alger, Exhibit 1 to Alger's Motion (the "Femrite Affidavit"), P 2). Alger does not own, use or possess any real property within Pennsylvania; it does not pay business or other taxes to Pennsylvania; it does not maintain any offices, or have any agents or employees, located within the Commonwealth. (Femrite Affidavit, PP 6, 8, 9, 10). It has not consented to the jurisdiction of any Pennsylvania court. (Femrite Affidavit, P 13).

Alger has had sporadic business contacts with Pennsylvania over the years. A review of Alger's sales from 1999 through 2006 showed four sales to a Pennsylvania company, with the last one made in 2001. These sales totaled $2,156.93, or approximately 0.001% of Alger's total sales during that period. (Second Femrite Affidavit, Exhibit C to Alger's Motion, P 6).

The allegedly defective brass sleeve nut, manufactured by Alger and then incorporated in the Hayward filter, was not sold [*3] to Hayward in Pennsylvania. Alger maintains, and Pierce does not dispute, that all brass sleeve nuts sold by Alger to Hayward were shipped to Hayward's facilities in California or North Carolina, not to Pennsylvania. (Femrite Affidavit, P 17; James Hemingway, N.T.41, Exhibit E to Alger's motion). There is no evidence that Alger knew, at the time it supplied brass sleeve nuts to Hayward in California in 1998 (when the pool filter was manufactured) that Hayward distributed products in all 50 states. (Stipulation of Counsel, P 2).

During the seven year period from 1999 to 2006, Alger made fifty-eight purchases of goods or services from Pennsylvania totaling $149,303, or approximately $22,000 per year. These purchases amounted to 0.082% of Alger's total sales during that period. (See Femrite Affidavit P 8 and Exhibit D to Alger's Motion). Alger did not directly purchase metal used to manufacture the brass sleeve nuts for Hayward from any Pennsylvania vendor. (Stipulation of Counsel, P 1).

In addition to these sales and purchases of products, Alger maintains a website, www.alger1.com, that is available to Pennsylvania residents. The website was not used to buy or sell the sleeve nut at [*4] issue. It enables users to learn information about the company and to click on a map of Pennsylvania, from which they are then referred to the phone number of an Alger sales representative in California. The website lists sales representatives dedicated to at least 20 states other than Pennsylvania but none for Pennsylvania. Pennsylvania residents can view products offered by Alger and electronically submit prints of specific parts sought to be purchased. They can also apply for employment with Alger online, with a free gift promised for doing so. Products cannot be ordered online and communication can only be initiated through an email link.

## II. Discussion

### A. Standard of Review

[HN1] Once a defendant asserts a lack of personal jurisdiction, the burden to prove otherwise is on the plaintiff. *Provident Nat. Bank v. California Fed. Sav. & Loan, Inc., 819 F.2d 434, 437 (3d Cir. 1987)*. To satisfy this burden, a plaintiff must establish with reasonable particularity sufficient contacts between the defendant and the forum state. *Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)*.

[HN2] A federal court exercises personal [*5] jurisdiction to the extent authorized by the state's long-arm statute. See *Fed. R. Civ. P. 4(e)*. Pennsylvania's statute extends jurisdiction to the fullest extent allowable under the Constitution, *42 Pa.Cons.Stat.Ann. § 5322(b)*, so the question is whether the exercise of personal jurisdiction over Alger is constitutional. See *Mellon Bank, 960 F.2d at 1221*. Constitutional jurisdiction can be established two different ways: specific jurisdiction and general jurisdiction. See *Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. Specific jurisdiction is established when the basis of the "plaintiff's claim is related to or arises out of the defendant's contacts with the forum." *Pennzoil Products Co. v. Colelli & Assoc., Inc., 149 F.3d 197, 201 (3d Cir. 1998)* (citations omitted). General jurisdiction does not require the defendant's contacts with the forum state to be related to the underlying cause of action, *Helicopteros, 466 U.S. at 414*, but the contacts must have been "continuous and systematic." *Id at 416*. [*6]

Alger contends that Pierce has not met its burden to establish either kind of jurisdiction.

**B. Specific Jurisdiction**

[HN3] The Pennsylvania Long Arm statute, *42 Pa. C.S.A. § 5322*, provides that specific jurisdiction can be exercised over a defendant who "transact[s] any business" in Pennsylvania or "caus[ed] harm or tortious injury in [Pennsylvania] by an act or omission outside of [Pennsylvania]." In deciding whether specific personal jurisdiction is appropriate, a court must first determine whether the defendant had the minimum contacts with the forum necessary to have reasonably anticipated being haled into court there. *Pennzoil, 149 F.3d at 201*, citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*. Second, assuming minimum contacts have been established, a court may inquire whether the assertion of personal jurisdiction would comport with traditional conceptions of fair play and substantial justice. *Pennzoil, 149 F.3d at 201*, citing *Burger King Corporation v. Rudzewicz, 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*; *International Shoe Co. v. Washington, 326 U.S. 310, 320, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. [*7] The first step is mandatory but the second step is discretionary. See *Pennzoil, 149 F.3d at 201*.

[HN4] In addition to direct sales of products into a forum state, a defendant may create the minimum contacts necessary for a court to assert specific jurisdiction by placing a product into the "stream of commerce," which through a chain of distribution finds its way into the forum state. See *Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)*; *Renner v. Lanard Toys Ltd., 33 F.3d 277, 279 (3d Cir. 1994)*. In its plurality opinion, the Supreme Court in Asahi proposed three separate tests for establishing stream of commerce jurisdiction. One test is whether any conduct by a defendant shows an intent to serve the market in the forum state. *Id. at 112 (O'Connor, J.)*. A second test requires demonstration of an awareness that the final product is marketed in the forum state in the "regular and anticipated flow of products". *Id. at 117 (Brennan. J., concurring)*. A third test would evaluate the volume, value and hazardous nature of the goods entering the forum state. *Id. at 122 (Stevens, J., concurring)*.

[HN5] Our [*8] Court of Appeals has not yet adopted any of the three stream of commerce tests announced in Asahi. See *Pennzoil, 149 F.3d at 205*; *Renner, 33 F.3d at 281-82*; *Affatato v. HAZET-Werk, 2003 U.S. Dist. LEXIS 21067, 2003 WL 22797786 (E.D. Pa. Nov. 19, 2003)*. However, it has made clear that a defendant must have engaged in some form of "purposeful availment" of the laws of the forum state. Cf.

*Pennzoil, 149 F.3d at 207* (purposeful availment found where defendant sold sixty percent of two grades of oil to Pennsylvania refineries; defendant knew the oil was going to Pennsylvania; and defendant was designing a product for the Pennsylvania market); with *Renner, 33 F.3d at 283* (no purposeful availment by Hong Kong toy manufacturer in merely placing product, F.O.B. Hong Kong, into the stream of commerce). [1]

> 1    The Court of Appeals in Renner found the record regarding "purposeful availment" was ambiguous and remanded for further proceedings. *33 F.3d at 284*.

[*9] Pierce argues that specific jurisdiction under the "stream of commerce" theory is present because (1) component parts Alger sold to Hayward were incorporated in the Hayward pool filter; (2) Hayward is an international corporation making regular sales in Pennsylvania (3) Hayward has authorized dealers in Pennsylvania; (4) Hayward has sales in excess of $500 million and over 1,500 employees; and (5) Hayward products are marketed worldwide. Pierce concedes there is no evidence that Alger knew, at the time it supplied the brass sleeve nut to Hayward, that Hayward distributed its products to all 50 states (Stipulation, P 2). The facts cited by Pierce may establish personal jurisdiction over Hayward because of its distribution of products in Pennsylvania, but they are not sufficient to establish jurisdiction over Alger. Mere forseeability that the defendant's products may end up in the forum state is not sufficient for "stream of commerce" jurisdiction. *Pennzoil, 149 F.3d at 203*. The defendant must have demonstrated some "purposeful availment" of the laws of the forum state. *Id.*

No such purposeful availment has been shown here. The sleeve nut in question was not sold [*10] in Pennsylvania, and no other Alger sleeve nuts were sold to Pennsylvania businesses. Alger's other sales to Pennsylvania were very insignificant and sporadic. Although Alger's sleeve nuts, after incorporation in Hayward's products, entered Pennsylvania through a chain of distribution, this fact alone is insufficient to exercise personal jurisdiction under any of the three stream of commerce tests announced in *Asahi*. Apart from its website, Alger did not exhibit any conduct showing an intent to service the Pennsylvania market. There was no evidence of the regularity of Alger's sleeve nut in Hayward's filters reaching Pennsylvania. There was no evidence of the volume and value of Alger's sleeve nuts reaching Pennsylvania through incorporation in Hayward pool filters. The sleeve nut was not hazardous by nature. Pierce has not established sufficient minimum contacts with Pennsylvania to show that it could have reasonably anticipated being sued here or that

any of the three Asahi tests for the exercise of specific jurisdiction have been met.

### C. General Jurisdiction

[HN6] Pursuant to Pa. C.S.A. § 5301(2), general jurisdiction can be exercised over a corporation in Pennsylvania [*11] if the corporation: (a) is incorporated in Pennsylvania; or (b) has consented to jurisdiction; or (c) carries on a continuous or systematic part of its general business in Pennsylvania. Whether Pierce can establish general jurisdiction depends on whether Alger has carried out continuous and systematic business within Pennsylvania. See *Helicopteros, 466 U.S. at 416; Provident, 819 F.2d at 437*. Numerous factors are used to assess the level of contacts, including the maintenance of offices, location of assets or employees within the forum state, as well as direct advertising and sales in the forum state. See *Hlavac v. DGG Props., 2005 U.S. Dist. LEXIS 6081, 2005 WL 839158, at *3 (E.D. Pa. Apr. 8, 2005); see also Corporate Aviation Concepts, Inc. v. Multiservice Aviation Corp., 2003 U.S. Dist. LEXIS 21108, 2003 WL 22794693, at *3 (E.D. Pa. Nov. 13, 2003)* (listing factors). The amount of business conducted in the state is less important than the nature of defendant's business in the state, that is, whether the business dealings are central to the defendant's business and how frequently such dealings occur. Cf. *Provident, 819 F.2d at 438* (California bank's maintenance of [*12] controlled disbursement account at a Pennsylvania bank, with daily accounting of monies, constituted "substantial, ongoing, and systematic activity in Pennsylvania," because it was a central part of the defendant's business, even though less than 1% of defendant's loans and deposits originated in Pennsylvania); see *Modern Mailers, Inc. v. Johnson & Quin, Inc., 844 F. Supp. 1048, 1053-54 (E.D. Pa. 1994)* ($231,000 of direct sales to Pennsylvania, less than 1% of Illinois company's sales, was not sufficient to establish jurisdiction because the sales were not central to defendant's business and did not involve substantial continuous regular contact).

Pierce concedes that Alger's sales to Pennsylvania are de minimis (Pierce Response, Brief at 14), so it does not rest its claim to jurisdiction on such sales. Pierce instead contends that Alger carries on a "continuous and systematic part of its business" in Pennsylvania by its purchases of raw materials from Pennsylvania vendors and by its maintenance of an interactive website.

#### a. Purchases of Products

Alger's purchases from Pennsylvania vendors totaled only $149,303, less than $22,000 per year or 0.082% [*13] of Alger's cumulative sales during that period. Pierce counters that in 2001 alone, Alger purchased

109,000 pounds of raw brass from Pennsylvania vendors. This may seem like a large quantity without context, but Alger's website declares purchases of 10,000,000 pounds of raw materials annually, so the Pennsylvania purchases would constitute only 1% of total annual purchases. Even if there were a significantly larger volume, [HN7] "mere purchases, even if occurring at regular intervals, are not enough to warrant a state's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros, 466 U.S. at 418* (Columbian corporation's purchases of 80% of its helicopters from Texas and $4,000,000 worth of parts did not constitute systematic and continuous contacts necessary to establish general personal jurisdiction). [2]

> 2 The *Helicopteros* holding was limited to foreign corporations, but the Supreme Court relied on, and did not overrule, the previous case of *Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516, 43 S. Ct. 170, 67 L. Ed. 372 (1923)* (Brandeis, J.), in which purchases and related trips were deemed insufficient to support personal jurisdiction.

#### [*14] b. Alger's Website

Pierce also contends that Alger's website demonstrates its continuous and systematic business operations in Pennsylvania. There is no allegation that the brass used in the allegedly defective sleeve nut was purchased over the internet or that the sleeve nut was sold via the internet so that the exercise of specific jurisdiction would be appropriate. The website is relevant only if it demonstrates evidence of sufficient continuous business to establish general jurisdiction over Alger.

Since the advent of the internet, which allows easy communications, commerce, and general transactions across state lines, courts have struggled to address jurisdictional issues arising from these electronic activities. [HN8] To the extent that a direct solicitation or contractual agreement sent via email directly leads to a civil action, jurisdiction is readily exercised. Actions involving domain names that infringe on trademarks, or companies that offer purely (or primarily) internet-based services are also straightforward; jurisdiction and interstate activities are central to the case, so the exercise of specific jurisdiction is warranted. In personal injury cases, plaintiffs [*15] have attempted to assert general personal jurisdiction over non-resident defendants based solely on the existence of a defendant's website having nothing to do with the alleged injury. Because a website is always available, it is likened to "continuous and systematic" activity in the forum state.

A leading case regarding personal jurisdiction based on a website is *Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997),* in which the district court established a sliding scale test, with personal jurisdiction found to be appropriate if a website was "interactive" but not if the website was "passive". In Zippo, a manufacturer of lighters had sued a California company for trademark infringement after it registered a series of domain names that included the plaintiff's trademark. The defendant used the domain names in its website newsgroup postings. The court held that personal jurisdiction was proper because the California company had about 3,000 Pennsylvania subscribers who regularly downloaded messages containing the purported trademark infringements. Purposeful availment was established by the processing of applications from Pennsylvania residents [*16] and the assignment of passwords to the web site. The alleged trademark infringements were deemed to have occurred in Pennsylvania when local residents viewed the site, and the state was found to have a substantial interest in protecting the trademarks of its residents.

Our Court of Appeals considered personal jurisdiction in another trademark case based on an infringing website in *Toys "R" Us, 318 F.3d at 446.* The Court discussed the "sliding scale" approach of Zippo and called it the "seminal authority" on these types of cases. *Id. at 452.* It held that [HN9] "the mere operation of a commercially interactive web site should not subject the operation to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." *Id. at 454.* [3]

> 3  Ultimately, the court determined that further discovery was necessary to determine whether there was purposeful availment. *Id. at 455.*

[*17] While Zippo offers a simple test for courts to follow based on the level of website interactivity, interactivity is not the only consideration, especially in a personal injury case where the website is unrelated to the cause of action. See generally Dennis T. Yokoyama, You Can't Always Use the Zippo Code: The Fallacy of a Uniform Theory of Internet Personal Jurisdiction, *54 DePaul L. Rev. 1147 (2005)* (evaluating courts' adoption of the Zippo test). [HN10] Courts have shown a reluctance to exercise personal jurisdiction based solely on a website and have looked at interactivity along with other factors. Three Eastern District of Pennsylvania decisions are instructive.

In *O'Connor v. Sandy Lane Hotel Co., 2005 U.S. Dist. LEXIS 7397, 2005 WL 994617 (E.D. Pa. Apr. 28, 2005)* (Joyner, J.), the court found that the defendant hotel in Barbados was not subject to general jurisdiction in a personal injury case despite the fact that it operated a website accessible to Pennsylvania residents. [HN11] "[M]uch like an in-print advertising campaign, the website must either be 'central' to the defendant's business in the forum state or specifically target residents of the forum state." [*18] *2005 U.S. Dist. LEXIS 7397, [WL] at *3* (citing *Snyder v. Dolphin Encounters, 235 F. Supp. 2d 433, 440-41 (E.D. Pa. 2002)*).

In *Hlavac v. DGG Properties, 2005 U.S. Dist. LEXIS 6081, 2005 WL 839158 (E.D. Pa. Apr. 8, 2005)* (Yohn, J.), the defendant, a Connecticut resort, operated a website through which visitors could purchase gift certificates and inquire about reservations but not book online. Plaintiffs claimed they would not have chosen the resort but for the website. Using the Zippo test, the court determined that the resort's website was not sufficiently interactive to justify general jurisdiction, and the ability to purchase gift certificates was insufficient because plaintiffs had not alleged any facts suggesting that gift certificates were "central to defendants' business." *2005 U.S. Dist. LEXIS 6081, [WL] at 6.* The court also found the exercise of general jurisdiction to be inappropriate because the website was not designed specifically to reach customers in Pennsylvania. Id., citing *Molnlycke Health Care AB v. Dumex Med. Surgical Prods., Ltd., 64 F. Supp. 2d 448 (E.D. Pa. 1999)* and *Toys "R" Us, 318 F.3d at 446.*

In *Snyder v. Dolphin Encounters Ltd., 235 F. Supp. 2d 433 (E.D. Pa. 2002)* [*19] (Brody, J.), personal jurisdiction was found lacking over a Bahamian corporation despite the fact that it received 5% of its website information requests from Pennsylvania and 3% of its overall requests from Pennsylvania. The court reasoned that the contacts were "insufficient to comprise the continuous and systematic contacts necessary to establish personal jurisdiction." *Id. at 438.* Considering the Zippo formulation and citing Molnlycke, the court also found that the website was not sufficiently interactive to establish general jurisdiction, even though it included an on-site order form, an on-site "ask the trainer" form, an on-site souvenir order form, and an on-site page allowing correspondence with management personnel (accessed more than 1,400 times by Pennsylvania IP addresses). *Id. at 440.* The court found that the websites were not targeted specifically to Pennsylvanians and were not central to the defendant's business in Pennsylvania. *Id. at 440-41.* See also *Horizon Aggressive Growth, L.P. v. Rothstein Kass, P.A., 421 F.3d 1162 (11th Cir. 2005)* (requiring "connexity"

2006 U.S. Dist. LEXIS 81393, *

between the out-of-state communications [*20] and the cause of action).

[HN12] There is an understandable judicial reluctance to extend the traditional limits on the exercise of personal jurisdiction over defendants based solely on a website accessible from the forum state. Whether the site is deemed not interactive enough, not targeted toward the forum state, not central to the defendant's business, or simply having no "connexity" to the cause of action, courts have resisted asserting general jurisdiction in these circumstances. Pierce's counsel contends that the decisions in *Mar-Eco, Inc. v. T&R & Sons Towing & Recovery, Inc., 2003 Pa.Super. 444, 837 A.2d 512 (2003)* and *Gammino v. SBC Communs., Inc., 2005 U.S. Dist. LEXIS 5077 (E.D. Pa. March 29, 2005)* support the exercise of jurisdiction based on Alger's website. Both of these cases are distinguishable. First, neither is a personal injury case. [4] Second, using the *Zippo* analysis, both websites had elements of substantial interactivity. The website in Mar-Eco was highly interactive, as it enabled one to complete nearly an entire vehicle purchase transaction on the site; the Gammino website linked Pennsylvania residents to a subsidiary's [*21] highly interactive website, Cingular Wireless.

    4 Mar-Eco was an action for unjust enrichment against a Maryland motor vehicle dealer for failing to record timely the Pennsylvania dealer's interest in vehicles sold. Gammino was a patent infringement case.

The Alger website is not highly interactive, and users can only initiate a communication through an email link or an online employment form. Users can click on a map of Pennsylvania, but they are then referred to the number of an Alger sales representative in California. A prospective employee can apply for a job online, and a free gift is promised to users who submit an application on line. Pierce makes much of a potential customer's ability to send prints over the internet, or the ability to apply for employment online, but there is no transaction, purchase or sale, that can be consummated by means of the website. Under the *Zippo* analysis, the website is not sufficiently interactive to support a finding of personal jurisdiction.

In addition, [*22] there is no connection between the website and the cause of action here. The website does not demonstrate a "conscious choice to conduct business with the residents" of Pennsylvania and "intentionally interact with [Pennsylvanians] via the web site in order to show purposeful availment..." *Toys "R" Us, 318 F.3d at 446*. The website is not targeted specifically to reach Pennsylvanians and is not central to the defendants's business in Pennsylvania. See *Molynlycke Health Care, 64 F. Supp. 2d at 448*. No sales are conducted by means of the web. Users cannot link to a specific sales representative for Pennsylvania and are instead routed to an email link for Alger's headquarters in California. The capabilities that are offered, *ie.*, the ability to send prints, view product lines and submit employment applications, are simply not enough to find that the exercise of personal jurisdiction is warranted. As Judge Brody stated, "[a] passive website that does little more than provide information is not grounds for the exercise of personal jurisdiction... If the contacts at issue here establish general personal jurisdiction, then any corporation with websites [*23] like [defendant's] would be subject to general jurisdiction in every state." *Snyder v. Dolphin Encounters Limited, 235 F. Supp. 2d at 441*. The same is true here.

**III. Conclusion**

For the reasons discussed above, Alger's motion to dismiss for lack of personal jurisdiction is granted. An appropriate Order follows.

**ORDER**

AND NOW, this 6th day of November, 2006, upon consideration of Alger Manufacturing Company's Renewed Motion To Dismiss for Lack of Jurisdiction and the plaintiffs' response thereto, it is **ORDERED** that:

**1.** Alger's Motion To Dismiss for Lack of Jurisdiction (Paper # 221) is **GRANTED.**

**2.** Alger's Motion for Leave to File a Reply (Paper # 227) is **DENIED** as moot.

/s/ Norma L. Shapiro

S.J.

134QX7

********** Print Completed **********

Time of Request: Tuesday, April 08, 2008  09:46:50 EST

Print Number:    1842:85869040
Number of Lines: 430
Number of Pages:

Send To:  BUTLER, STEVEN
          LINARDUCCI & BUTLER
          910 W BASIN RD STE 100
          NEW CASTLE, DE 19720-1015

134QX7

**Time of Request:** Tuesday, April 08, 2008  09:49:02 EST
**Client ID/Project Name:** citizens
**Number of Lines:** 132
**Job Number:**        1821:85869577

Research Information

**Service:**   Terms and Connectors Search
**Print Request:** Current Document: 4
**Source:** 3rd Circuit - US Court of Appeals, District & Bankruptcy Cases, ...
**Search Terms:** name(nice)

**Send to:**  BUTLER, STEVEN
             LINARDUCCI & BUTLER
             910 W BASIN RD STE 100
             NEW CASTLE, DE 19720-1015